**T & T MANUFACTURING COMPANY, Plaintiff,**

**Jonathan Bradley Pens, Inc., Intervenor,**

**The Quill Company, Inc., Second Intervenor, Appellee,**

v.

**A. T. CROSS COMPANY, Defendant, Appellant.**

**No. 78–1206.**

United States Court of Appeals, First Circuit.

Argued Sept. 12, 1978.

Decided Nov. 29, 1978.

---

Leslie D. Taggart, New York City, with whom Herbert B. Barlow, Jr., Barlow & Barlow, Providence, R. I., Frank J. Colucci, Howard B. Barnaby, Jr., and Watson, Leavenworth, Kelton & Taggart, New York City, were on brief, for appellant.

James K. Edwards, Providence, R. I., with whom Edwards & Angell, Providence, R. I., Robert L. Thompson, and Thompson, Birch, Gauthier & Samuels, Boston, Mass., were on brief, for The Quill Company, Inc., appellee.

Before KUNZIG,* Judge, U. S. Court of Claims, BOWNES, Circuit Judge and DUMBAULD,** District Judge.

KUNZIG, Judge.

The sole issue presented for review in this trademark infringement appeal is the validity and enforceability of a Settlement Agreement entered into by the defendant A. T. Cross Company (Cross) and The Quill Company (First Quill) permitting the manu-

* Sitting by designation.

** Of the Western District of Pennsylvania, sitting by designation.

facture and sale of certain pens and pencils. Chief Judge Raymond J. Pettine of the United States District Court for the District of Rhode Island held, *inter alia*, the Agreement was valid and enforceable and hence estopped Cross from asserting trademark infringement and unfair competition claims as outlined *infra*. Because we agree with the district court, we affirm.

The history of the case is confused and complicated. On June 15, 1951, trademark registrations were issued to Cross for a black top and on April 11, 1967 for a gold top on its mechanical pens and pencils.

In 1965, The Quill Company (First Quill) was engaged in the manufacture of mechanical pens and pencils. On October 25, 1965, Cross filed suit against First Quill alleging infringement and unfair competition of its black top trademark. The action was subsequently settled by an agreement (the "Settlement Agreement") under the terms of which First Quill was allowed to continue manufacturing its writing instruments that had black, silver and gold conical tops. The precise wording of the Settlement Agreement is:

1. QUILL hereby agrees not to manufacture or sell any writing instrument which has an exterior appearance closer to the exterior appearance of the CROSS pen and pencil attached hereto as Exhibits A and B than the exterior appearance of the QUILL pen and pencils attached hereto as Exhibits C, D and F, so long as the said CROSS trademark registrations remain in full force and effect.

2. CROSS agrees that it will not sue QUILL for unfair competition, infringement of said trademark or infringement of said trademark registrations unless QUILL breaches the agreement of paragraph 1.

3. CROSS hereby releases QUILL and its customers from all debts, complaints, demands and causes of action whatsoever such as have arisen by reasons of or in any manner grown out of the facts alleged in said Civil Action prior to the date of this agreement.

4. The parties agree that forthwith after the execution of this agreement said Civil Action shall be terminated by a Consent Judgment dismissing it without prejudice and without any award of damages or costs to either party.

5. This agreement shall be deemed to constitute a contract made under the laws of the State of Rhode Island and for all purposes shall be construed in accordance with the laws of such State.

6. This agreement shall be binding upon and inure to the benefit of each party, its successors in business and assigns.

On November 21, 1969, Cross sought to register a variation of its black top trademark, a silver top, in the United States Patent and Trademark Office. T & T Manufacturing Company (T&T) opposed the application on the grounds of prior first use and continuous manufacture of its pen and pencils with a silver top. The Trademark Trial and Appeal Board (the Board) held in favor of Cross concluding that it had the right to register the silver top trademark.

T&T then timely filed its complaint in the district court seeking to overturn the Board's decision.[1]

In March 1972, before the Board decision was rendered, T&T purchased from First Quill the Settlement Agreement between First Quill and Cross. Additionally, T&T also purchased the pen and pencil equipment and supplies that First Quill had on hand. Thereafter, on September 21, 1972, T&T incorporated Second Quill as a wholly owned subsidiary. Seven days later, T&T executed an assignment of its rights under the Settlement Agreement to Second Quill as well as selling to it the equipment it had acquired from First Quill. From that time on, Second Quill has been in the business of manufacturing and selling pens and pencils, conceded by both parties to be legally identical to those instruments covered in the Settlement Agreement.

---

1. Originally T&T filed for review in the United States Court of Customs and Patent Appeals (C.C.P.A.). However, pursuant to 15 U.S.C. § 1071, Cross elected to have the appeal heard in the United States District Court, thus terminating the C.C.P.A. appeal.

Shortly after T&T filed its complaint in the district court, First Intervenor Jonathan Bradley Pens, Inc. (Bradley) joined with T&T in also seeking the overturn of the Board's decision. Bradley further requested a declaration that its use of a silver top on its pens and pencils did not infringe any of Cross' trademarks. Cross then counter-claimed against Bradley seeking injunctive relief and an accounting.

Second Quill then entered the litigation as Second Intervenor, joining with Bradley and T&T in seeking the relief sought by T&T (challenging Cross' right to register the silver top as a trademark). By counter-claim against Second Quill, Cross asked the court for an injunction preventing Second Quill from manufacturing and selling its writing instruments on grounds of unfair competition and trademark infringement. Second Quill, in its defense to the counter-claim, asserted (1) that it had not infringed and (2) that Cross was estopped on the basis of the 1967 Settlement Agreement it had entered into with First Quill from suing Second Quill for unfair competition and trademark infringement in the manufacture and selling of writing instruments, conceded to be legally identical to those covered by the Agreement.

By a Stipulation of Partial Discontinuance entered on June 29, 1977, the Complaints of T&T and Bradley, as well as Cross' counter-claims against them, were dismissed with prejudice. Additionally, Second Quill's opposition to the Board's ruling permitting Cross to register its silver top as a trademark was dismissed with prejudice and the Board's decision was affirmed. Thus, the district court was left to resolve two questions: (1) whether Second Quill infringed Cross' registered trademarks and engaged in unfair competition; and (2) whether by virtue of the Settlement Agreement Cross was estopped from suing Second Quill.

The district court, by decision entered March 24, 1978, held that (1) Cross' trademarks were valid; and the writing instruments being manufactured and sold by Second Quill were legally identical to Cross'

registered trademarks and thus infringed them *but* (2) by virtue of the 1967 Settlement Agreement, Cross was estopped from suing Second Quill for the infringement of its trademarks and unfair competition.

By judgment entered April 11, 1978, Chief Judge Pettine dismissed Cross' counter-claim *against* Second Quill with prejudice and noted that Second Quill had the right to continue the manufacture and sale of the pens and pencils in question. Thereafter, Cross timely perfected its appeal to this court. Both parties have agreed and conceded at oral argument that the sole issue for review is whether or not the Settlement Agreement is valid and enforceable so as to permit Second Quill's continued manufacture and sale of the pens and pencils covered by the Agreement.

Thus, the remaining parties in this action are Cross, by counter-claim, seeking an injunction against Second Quill to bring a halt to the alleged trademark infringement.

Cross draws upon a two-tiered approach in attacking the validity and the enforceability of the Agreement. First, (a) it maintains that the Settlement Agreement originally conferred rights in its trademarks to First Quill which were later *abandoned* when First Quill went out of business. Thus, the resulting assignment of the Settlement Agreement between First Quill and T&T was a nullity, contends Cross, since a trademark may not be assigned without the accompanying business and attendant good will. As a consequence, First Quill had no rights which it could assign to T&T and Second Quill can therefore not rely on the Settlement Agreement in defense of Cross' counter-claim for infringement and unfair competition.

Next (b), Cross urges that even if the assignment is deemed valid, the Settlement Agreement should not be enforced on grounds of public policy since the district court made a finding of "likelihood of public confusion" between the products of Second Quill and Cross.

Second Quill counters (a) that the assignment of the Settlement Agreement, conveyed no rights in Cross' trademark but

merely was an agreement not to sue. Hence any argument as to trademark rights or abandonment of such rights is irrelevant. Moreover, (b) Second Quill argues that likelihood of public confusion is not the *sine qua non* as to the enforceability of the Settlement Agreement and that other considerations of policy dictate that the Agreement be enforced against Cross.

We hold for Second Quill.

The threshold issue to be resolved is whether the Settlement Agreement is to be governed by the principles of trademark law, and thus the law of abandonment and non-use, or is it a contract to be enforced as such?

Cross has argued that the law of abandonment and non-use of a trademark by an original owner prevents a subsequent assignment of such a trademark.

 Cross' position, however, fails to address itself to the essential inquiry of whether First Quill obtained in the Settlement Agreement any rights in Cross' trademark. We agree with Chief Judge Pettine when he pointed out that Cross entered into the Settlement Agreement because it ". . . chose not to test the validity of its mark and so it settled the case with First-Quill. Cross did not transfer any of its business or good will. When the contract [Settlement Agreement] was made, the mark had not been abandoned. The trademark was not assigned by that contract and as a consequence First-Quill did not acquire any part of the trademark—which of course it could not. All it got was a contract right to be free of suit even if it manufactured and sold certain specified writing instruments, together with the right to assign the benefits under the agreement to its 'successors in business and assigns.'" *T&T Mfg. Co. v. A. T. Cross Co.,* 449 F.Supp. 813, 825 (D.R.I.1978).

Additionally, we note the Settlement Agreement did not refer to the First Quill

top itself as a trademark item, nor did the First Quill-T&T assignment or the T&T-Second Quill assignment. Thus, these additional facts, while not dispositive, give credence to the conclusion of the district court that the Settlement Agreement was not an assignment of a trademark, but rather a "contract right to be free of suit." Moreover, there was no time limitation placed on the Agreement's duration nor was there any indication the Agreement's validity would be dependent on First Quill maintaining a specified level of business activity.

Based on the foregoing, we find that the Settlement Agreement is to be enforced according to general principles of contract law, being essentially a contract to be free from suit, and thus the law governing trademarks, including abandonment and non-use, is not applicable in the instant situation. This being the case, under the law of Rhode Island, which the parties made determinative, the benefits under the Settlement Agreement were freely assignable to First Quill's "successors in business and assigns." *Koury v. Sood,* 74 R.I. 486, 62 A.2d 649 (1945); *Swarts v. Narragansett Electric Lights Co.,* 26 R.I. 388, 59 A. 77 (1904), *rehearing denied,* 26 R.I. 436, 59 A. 111 (1904). Therefore, since we find the Agreement to be assignable, it is clear that Second Quill, a subsequent assignee of First Quill, has the right to assert the Agreement as a defense to Cross' counter-claim.

It remains to discuss the principal contention of Cross that the Settlement Agreement should not be enforced on grounds of public policy. Cross contends that an agreement settling a trademark dispute is to be enforced, but with one proviso, namely, that if such an agreement is likely to cause public confusion as to the respective products, then it should not be enforced.

 At the outset, we note that the decisional, as well as the statutory [2] law dealing with the area of trademarks is vitally con-

---

**2.** The Lanham Act, 15 U.S.C. § 1051 et seq., the main statutory framework dealing with trademarks was enacted principally for "the protection of trademarks, securing to the owner the good will of his business and protecting the public against spurious and false marked goods." S.Rep.No. 1333, 79th Cong., 2d Sess. (1946) in U.S.Code Cong. Service, 79th Cong., 2d Sess. at 1274–1278 (1946).

cerned with the protection of the public interest. As was stated by this court in *General Baking Co. v. Gorman*, 3 F.2d 891 (1st Cir. 1925):

> It should never be overlooked that trade-mark and unfair competition cases are affected with a public interest. A dealer's good will is protected, not merely for his profit, but in order that the purchasing public may not be enticed into buying A's product when it wants B's product. *Id.* at 893.

Against this backdrop, Cross maintains that since the district court held that there was a likelihood of public confusion between the products of Second Quill and Cross, it follows that the Settlement Agreement allowing Second Quill to manufacture and sell such products may not be enforced.

■ We cannot agree with Cross that merely because the district court made a finding of likelihood of public confusion that *ipso facto* the Settlement Agreement should now not be enforced according to its terms. Rather, we agree with the district court's approach that the *degree* or *extent* of public confusion must be examined in order to ascertain whether there is any significant harm to the public by decreeing enforcement of the Settlement Agreement. Additionally, there are other considerations, most notably the policy, vital to the law of contracts, of holding people to the terms of agreements knowingly and wilfully entered into. These must also be considered in resolving the question of enforcement of the Settlement Agreement.

Courts have traditionally, in disputes similar to the present case, weighed the public interest concerning trademarks against the interest in contract enforcement. *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328–29 (6th Cir. 1973), *cert. denied* 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108, *rehearing denied*, 414 U.S. 1033, 94 S.Ct. 465, 38 L.Ed.2d 326 (1973). In *Beer Nuts*, the court concluded that a party could not challenge a trademark as a descriptive word because by

contract it had lost that defense. In deciding this, the court balanced the interest in "guarding against the depletion of the general vocabulary" of descriptive words against the contract interest that "a person should be held to his undertakings." *Id.* at 329.

Similarly, in *Peyrat v. L. N. Renault & Sons, Inc.*, 247 F.Supp. 1009 (S.D.N.Y.1965), the court reviewed a contract permitting the importation of brandy under the same name as that used by the defendant in selling its wines. Therein the court stated, "The parties to a trademark controversy may contract between themselves for any legal purpose. The agreement is for a legal purpose and is valid and enforceable so long as no injury is caused to the public." *Id.* at 1014. The court, while noting that confusion as to the source of a consumer product is the type of public injury to be prevented, concluded that any such likelihood of confusion was sufficiently abrogated by the differing channels of commerce through which the two products traveled.

In the present case, the district court, following the spirit of previous cases, correctly evaluated the competing interests of contract enforcement with any harm the public might experience due to confusion arising between the products of Second Quill and Cross.

■ We observe that there was no allegation that the products of First Quill were inferior to Cross, nor was the Settlement Agreement entered into with any intent to deceive the public. Moreover, the Settlement Agreement specifically consented to the manufacture of only those pens which bore a *Quill* insignia as a distinguishing characteristic. Based upon the foregoing, it is clear, as the district court found, that any harm to the public as the result of a likelihood of confusion would not be significant.[3]

The ascertainment of what is or is not in the public interest is often a difficult and nebulous task for a court to undertake. As

---

3. It is interesting to note that no evidence of *actual* confusion on the part of buyers or other consumers was adduced at trial.

the court stated in *Application of E. I. Dupont DeNemours & Co.*, 476 F.2d 1357, 1362, (Cust. & Pat.App.1973):

> Reasonable men may differ as to the *weight* to give specific evidentiary elements in a particular case. In one case it will indicate that confusion is unlikely; in the next it will not. In neither case is it helpful or necessary to inject broad maxims or references to "the public interest" which do not aid in deciding. Only the facts can do that.

On the basis of the facts of the present case, we hold that the Settlement Agreement should be enforced according to its terms. Since we find that any harm to the public is not significant as the result of a likelihood of confusion between Second Quill's and Cross' products, the policy of holding a party to its contractual undertakings becomes dominant. Added into this balance is the judicial policy of encouraging extra-judicial settlement of trademark litigation. In the words of Chief Judge Pettine:

> Insisting that a court review a settlement to assure that no public confusion will result would make such agreements of little value to the parties. *T&T Mfg. Co., supra* at 827.

Moreover, to do so would undermine the policy of giving deference to the contractual agreements of reputable businessmen-users of valuable trademarks. *See, Application of E. I. Dupont DeNemours & Co., supra.*

As a final observation, we note that Cross originally entered into the Settlement Agreement with full knowledge of a potential for immediate public confusion between its products and those of First Quill.[4] Now, some eleven years later, Cross seeks to disaffirm the Agreement on the basis of public confusion—the same basis it was instrumental in bringing about in the first place. It appears at best incongruous that a party should be permitted to disaffirm a contract as against public policy when such grounds are the very grounds that the party itself knowingly and wilfully helped to create. We decline so to do.

In summary, we hold the Settlement Agreement to be in the nature of a contract to be free from suit and clearly assignable under its terms. As a consequence, Second Quill, a subsequent assignee, validly asserted the Agreement as a defense to Cross' counter-claim. Additionally, since the likelihood of confusion causing serious harm to the public is de minimis, we find that in the case at bar, the policy of honoring contractual obligations predominates.

Accordingly, we hold upon careful consideration of all briefs and submissions and after oral argument that the judgment of the district court sustaining the validity and enforceability of the Settlement Agreement is

*Affirmed.*

---

4. Cross conceded at oral argument that First Quill was still in business manufacturing pens and pencils at the time of the Settlement Agreement.