335 F.3d 130
 IDAHO POTATO COMMISSION, Plaintiff-Appellant-Cross-Appellee,
v.
M & M PRODUCE FARM & SALES, doing business as M & M Produce, M & M Packaging, Inc., Matthew Rogowski and Mark Rogowski, Defendants-Counter-Claimants-Appellees-Cross-Appellants.
 Docket No. 02-7792(L).
 Docket No. 02-7818(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: March 18, 2003.
 Decided: July 11, 2003.
 
 David Zaslowsky, Baker & McKenzie, New York, N.Y., for Plaintiff-Appellant-Cross-Appellee.
 J. Joseph Bainton, Bainton McCarthy LLC, New York, NY (Irene M. Hurtado, on the brief), for Defendant-Counter-Claimants-Appellees-Cross-Appellants.
 Thurbert E. Baker, Attorney General; Robert S. Bomar, Deputy Attorney General; Isaac Byrd, Senior Assistant Attorney General; Timothy J. Ritzka, Assistant Attorney General; Marc P. Goncher, Assistant Attorney General; Atlanta, GA; for Amicus Curiae State of Georgia, in support of the Idaho Potato Commission.
 Kenneth Keck, General Counsel, Lakeland, FL, for Amicus Curiae Florida Department of Citrus, in support of the Idaho Potato Commission.
 Before: FEINBERG, F.I. PARKER and SOTOMAYOR, Circuit Judges.
 FEINBERG, Circuit Judge.
 
 
 1
 Plaintiff Idaho Potato Commission ("IPC") appeals from a May 2002 Memorandum and Order ("May 2002 Order") of the United States District Court for the Southern District of New York (Brieant, J.), vacating a $41,962 jury award for the IPC in its certification mark[1] infringement suit under the Lanham Act, 15 U.S.C. § 1051 et seq., against M & M Produce Farm and Sales, M & M Packaging, Inc., and Matthew and Mark Rogowski individually (collectively "M & M"). The district court held that under the circumstances of this case there was no basis for monetary damages absent a showing of counterfeiting. On appeal, the IPC argues that the Lanham Act does not require the owner of a certification mark to prove counterfeiting in order to recover monetary damages from an infringer.
 
 
 2
 Defendant M & M cross-appeals from the court's August 1998 Memorandum and Order ("August 1998 Order") denying M & M summary judgment on its counterclaims and holding that M & M was barred from seeking cancellation of the IPC marks by a no-challenge provision in its licensing agreement with the IPC.[2] M & M argues on appeal that the no-challenge provision should not be enforced because it violates the public policy embodied in the Lanham Act. M & M also argues that it was entitled to summary judgment on its counterclaims and attorneys' fees. For reasons stated below, we vacate the district court's August 1998 Order and remand for consideration of M & M's counterclaims on the merits. We also remand for clarification of the court's May 2002 Order on damages should M & M's counterclaims fail on the merits.
 
 I. Background
 A. Parties on Appeal
 
 3
 The IPC is an agency created by Idaho statute to promote the sale of Idaho russet potatoes and to prevent the substitution of potatoes grown in other regions as Idaho potatoes. To further these goals, the IPC has registered a number of certification marks with the United States Patent and Trademark Office, two of which are relevant to this appeal: (1) the word "IDAHO" in a distinctive font; and (2) the phrase "GROWN IN IDAHO" written inside an outline of the boundaries of the state of Idaho (collectively "the IPC marks"). Each mark certifies that "goods so marked are grown in the State of Idaho."
 
 
 4
 The IPC controls its marks through an elaborate licensing system that seeks to ensure the quality and geographic authenticity of potatoes packed in containers bearing the IPC marks. This system requires everyone in the chain of distribution, from in-state growers to out-of-state repackers and resellers, to be licensed in order to use the IPC certification marks on their packaging.[3] Licensed vendors are also prevented from selling Idaho potatoes to non-licensed customers for repacking or reselling.
 
 
 5
 The standard licensing agreements provide licensees with the right to use the IPC marks, an important benefit because certified Idaho potatoes sell for more than non-Idaho potatoes. In return, licensees agree, among other things, to use the IPC marks only on potatoes that are certified as grown in Idaho and that meet the IPC's other quality standards. Licensees also agree to maintain purchase and sale records so that the IPC can check periodically for compliance and prevent "counterfeiting" (putting non-Idaho potatoes in bags bearing the IPC marks.)
 
 
 6
 M & M is a small business in New York owned and operated by two brothers, Matthew and Mark Rogowski. M & M's main business is growing onions on a small farm, but because onions are a seasonal crop, the brothers also repack potatoes to stay in business throughout the year. In 1990, M & M entered into a licensing agreement with the IPC and was given the right to use the IPC's certification marks, subject to the terms in the agreement. While M & M was a licensee, it would purchase potatoes in bulk from licensed Idaho potato vendors and would repackage those potatoes into small five-pound bags bearing the certification marks.
 
 
 7
 In 1994, M & M received a notice of audit from the IPC requesting M & M's records with regard to all Idaho potatoes bought and sold. Because M & M did not produce sufficient records,[4] the IPC considered M & M in breach of the licensing agreement and requested that M & M return its license. In February 1995, M & M voluntarily gave up the license and consequently no longer had the right to use the IPC marks.
 
 
 8
 After returning the license, however, M & M continued repacking Idaho potatoes in bags with the IPC marks. M & M's major source of potatoes after February 1995 was G & T Terminal Packing, Inc. ("G & T"), a licensed reseller of Idaho potatoes. G & T is a large reseller of produce serving such supermarket chains as Pathmark, Twin County, Key Food, Grand Union and Wakefern.
 
 
 9
 The business relationship between M & M and G & T after M & M lost its license was complex. G & T would purchase potatoes in bulk directly from Idaho vendors. When G & T would receive an order for potatoes from one of its supermarket customers, it would call that order in to M & M. G & T would then "sell" potatoes to M & M, which would in turn repack the potatoes into smaller bags printed with G & T's name and the IPC marks and then deliver the repacked potatoes to G & T's customer. After delivering the potatoes, M & M would "sell" the potatoes back to G & T for a small profit and return the delivery ticket to G & T. The district court explained the business relationship between these two vendors, in which G & T was essentially selling and buying back the same potatoes, as follows:
 
 
 10
 In economic reality, G & T, a licensee of the IPC, was merely using M & M as an agent or independent contractor to repack G & T's potatoes in five pound bags with G & T's name on them as seller, and then deliver the potatoes to various customers of G & T in accordance with the directions of G & T, returning the delivery tickets to G & T. The supermarkets in most cases did not deal with M & M.
 
 B. Procedural History
 
 11
 During an October 1997 compliance audit of G & T, the IPC learned of the continuing business relationship between G & T and M & M. In November 1997, the IPC filed the current lawsuit against M & M alleging: (1) trademark infringement in violation of 15 U.S.C. § 1114, (2) false designation of origin and dilution in violation of 15 U.S.C. § 1125, and (3) unlawful and unfair competition in violation of various New York and Idaho statutes and common law.
 
 
 12
 In response, M & M filed counterclaims for, among other things, cancellation of the IPC marks under federal and state law. M & M argued that the IPC marks should be cancelled for numerous reasons, including that the IPC abused its marks by: discriminatorily refusing to certify potatoes that were grown in Idaho, imposing standards for certification beyond the geographic origin the marks are registered to certify, and using its certification marks for purposes other than to certify, all in violation of the Lanham Act. M & M also alleged that the IPC lacks the independence necessary for certification mark owners under the Lanham Act.
 
 
 13
 The pre-trial procedural history of this case is long and complicated. We give only a brief description of those proceedings relevant to the current appeal. In April 1998, this case was consolidated for pre-trial purposes with two other cases involving a challenge to the IPC marks — one a counterclaim brought by Majestic Produce Corp., the other a direct claim brought by Hapco Farms, Inc. In its August 1998 Order, the district court denied a joint motion for summary judgment filed by Hapco, Majestic and M & M. With regard to M & M, the court held that M & M was estopped from challenging the IPC marks by a provision in its licensing agreement in which M & M (1) acknowledged that the marks "are valid, registered marks;" and (2) agreed that it would "not during the term of the agreement, or at any time thereafter, attack the title or any rights" of the IPC in the relevant marks. Citing a number of trademark cases, the district court held that "courts have consistently enforced estoppel in circumstances directly analogous to this case." It further rejected any arguable distinction between trademarks and certification marks in this context explaining that "the owners of certification marks can license their marks, just as trademark holders can, and are therefore clearly entitled to licensee estoppel where the licensing agreement specifically provides for it."[5]
 
 
 14
 The IPC's claims for infringement against M & M proceeded to trial, and in February 2002 the jury returned a verdict for the IPC. The jury found that M & M had earned $41,962 in profits from selling potatoes in bags with the IPC marks without the consent of the IPC. However, the jury also found that the IPC did not prove that M & M had engaged in counterfeiting.
 
 
 15
 After trial, M & M moved to vacate the jury's damage award as a matter of law. In its May 2002 Order, the district court granted the motion, holding that the evidence "does not sustain the right to recover monetary damages, and therefore that portion of the jury verdict should be vacated."
 
 
 16
 The IPC appeals from the May 2002 Order vacating its damages award against M & M. M & M cross-appeals from the August 1998 Order holding M & M estopped from attacking the validity of the IPC marks.
 
 II. Discussion
 
 17
 Because the jury's verdict against M & M was predicated on the IPC's ownership of valid certification marks, we first discuss M & M's cross-appeal challenging the district court's August 1998 ruling that M & M was not entitled to summary judgment and was estopped by the licensing agreement from attacking those marks. We will then turn to the IPC's appeal from the district court's vacatur of its damages award.
 
 A. M & M's Cross-appeal
 1. Estoppel
 
 18
 The facts relevant to the issue are not in dispute. M & M signed a licensing agreement with the IPC in which M & M recognized the validity of the IPC marks and promised not to attack the rights of the IPC in those marks during the term of the agreement or at any time thereafter. The basic question on the facts before us, therefore, is whether such a provision in a certification mark licensing agreement is enforceable against a licensee when the licensee no longer holds a license. This question has apparently not yet been squarely decided by any federal circuit court.
 
 
 19
 M & M contends that the no-challenge provision in its licensing agreement should not be enforced because it violates the public policy embodied in the Lanham Act. It argues that by requiring licensees to forever waive their statutory right to challenge the IPC's marks, the IPC effectively avoids enforcement of the Lanham Act. M & M relies principally on the Supreme Court's opinion in Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), which held that the contract doctrine of licensee estoppel was trumped by the federal policy embodied in the patent laws. Id. at 670-71, 89 S.Ct. 1902. M & M argues that Lear should apply to certification mark licenses as it does to patent licenses because the public interest in both is similar. Thus, M & M asks us to adopt the rule stated by the United States Patent and Trademark Office, Trademark Trial and Appeal Board that "there can be no licensee estoppel involving a certification mark." Midwest Plastic Fabricators, Inc. v. Underwriters Labs., Inc., 12 U.S.P.Q.2d 1267, 1270 n. 6 (T.T.A.B.1989) aff'd on other grounds, 906 F.2d 1568, 1573 (Fed. Cir.1990) (explicitly avoiding the licensee estoppel issue).
 
 
 20
 We begin our analysis with the Supreme Court's opinion in Lear. The general rule of licensee estoppel provides that when a licensee enters into an agreement to use the intellectual property of a licensor, the licensee effectively recognizes the validity of that property and is estopped from contesting its validity in future disputes. See, e.g., Flex-Foot, Inc. v. CRP, Inc., 238 F.3d 1362, 1368 (Fed.Cir. 2001) (explaining doctrine of licensee estoppel applied prior to Lear). As noted above, the Supreme Court in Lear held that the doctrine does not necessarily control in disputes over the validity of patents. The Court identified in the patent laws the "strong federal policy favoring the full and free use of ideas in the public domain." 395 U.S. at 674, 89 S.Ct. 1902. It balanced that public interest against the "competing demands of the common law of contracts" as follows:
 
 
 21
 Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.
 
 
 22
 Id. at 668, 670-71, 89 S.Ct. 1902.
 
 
 23
 Courts applying the principles articulated in Lear to patent disputes have enforced no-challenge contract provisions only when the interests in doing so outweigh the public interest in discovering invalid patents. Thus, in Flex-Foot, the United States Court of Appeals for the Federal Circuit recently enforced an estoppel provision in a settlement agreement only after determining that the public policy in favor of settlements outweighed the public interest in patents. The court stated that "the important policy of enforcing settlement agreements and res judicata must themselves be weighed against the federal patent laws' prescription of full and free competition in the use of ideas that are in reality a part of the public domain." 238 F.3d at 1368. The court concluded that when an accused patent infringer contractually agrees to voluntarily dismiss litigation challenging the rights of a patent holder after having "had an opportunity to conduct discovery on validity issues," the accused infringer is contractually estopped from raising any challenge in a subsequent proceeding. Id. at 1370.
 
 
 24
 Other courts, including this one, have weighed these interests to reach differing results, but each has recognized the applicability of the balancing test first articulated in Lear. See, e.g., Warner-Jenkinson Co. v. Allied Chem. Corp., 567 F.2d 184, 187-88 (2d Cir.1977) (licensee could litigate the validity of patent even though licensing agreement was entered into as part of a settlement of earlier litigation); Schlegel Mfg. Co. v. U.S.M. Corp., 525 F.2d 775, 781 (6th Cir.1975) (enforcing consent decree, which recited that plaintiff's patent was valid); Kraly v. Nat'l Distillers & Chem. Corp., 502 F.2d 1366, 1369 (7th Cir.1974) (concluding that a licensee was not estopped from challenging the validity of a patent even where a consent decree incorporated an understanding that the patent would not be challenged); Massillon-Cleveland-Akron Sign Co. v. Golden State Adver. Co., 444 F.2d 425, 427 (9th Cir.1971) (holding that covenant in settlement agreement whereby defendants agreed not to contest validity of patent was unenforceable because in direct conflict with strong federal policy).
 
 
 25
 The Lear balancing test has also been frequently applied to trademark licensing contracts. As the district court here correctly noted, courts in this context have generally precluded licensees from challenging the validity of a mark they have obtained the right to use. However, courts have done so only after considering the public interest in trademarks. For example, in Beer Nuts, Inc. v. King Nut Co., the Sixth Circuit explicitly used the Lear balancing test in upholding a written agreement not to challenge the validity of a trademark. 477 F.2d 326, 329 (1973). The court distinguished the public policy of trademarks — guarding the public from being deceived into purchasing an unwanted product — from that of patents and held, "When the balancing test is employed in the instant situation, we conclude that the public interest in [trademarks] ... is not so great that it should take precedence over the rule of the law of contracts that a person should be held to his undertakings." Id.; see also MWS Wire Indus., Inc. v. California Fine Wire Co., 797 F.2d 799, 803 (9th Cir.1986) (relying on Beer Nuts and holding that "[t]o permit [defendant] to reopen the question of the validity of the trademark at this juncture would severely undercut the policy favoring the amicable resolution of trademark disputes without resort to the courts").
 
 
 26
 Even when courts have not expressly applied the Lear test, they have recognized that agreements related to intellectual property necessarily involve the public interest and have enforced such agreements only to the extent that enforcement does not result in a public injury. Thus, the First Circuit in T & T Manufacturing Co. v. A. T. Cross Co. asked "whether there is any significant harm to the public" before holding that a settlement agreement related to trademarks was enforceable. 587 F.2d 533, 538 (1st Cir.1978). The court noted generally that: "It should never be overlooked that trade-mark ... cases are affected with a public interest. A dealer's good will is protected, not merely for his profit, but in order that the purchasing public may not be enticed into buying A's product when it wants B's product." Id. (quoting Gen. Baking Co. v. Gorman, 3 F.2d 891 (1st Cir.1925)). The Ninth Circuit has applied the same rule. See VISA Int'l Serv. Assn. v. Bankcard Holders of America, 784 F.2d 1472, 1473 (9th Cir.1986) ("In general, a party entering into a settlement agreement with respect to a trademark will be held to his contract unless enforcement of the contract would result in injury to the public through confusion.").[6]
 
 
 27
 The IPC maintains that the Lear balancing test is inapplicable because unlike the contract in Lear, which was silent concerning the rights of the licensee to challenge the patent, the contract signed by M & M specifically precluded M & M from challenging the IPC's marks. However, this distinction does not negate the applicability of the Lear balancing test to the contract in this case. Lear itself recognized that federal policy embodied in the law of intellectual property can trump even explicit contractual provisions. The licensor in Lear argued that based on the licensee's explicit contractual agreement to pay royalties until invalidity of the patent had been determined by a court, the licensee was required to pay royalties for the duration of the litigation even if the patent in question was eventually declared invalid. 395 U.S. at 673, 89 S.Ct. 1902. The Lear Court disagreed and refused to enforce the contract on the same basis that it refused to apply licensee estoppel: "The parties' contract, however, is no more controlling on this issue than is the State's doctrine of estoppel, which is also rooted in contract principles." Id. Lear makes clear that courts should weigh the federal policy embodied in the law of intellectual property against even explicit contractual provisions and render unenforceable those provisions that would undermine the public interest. Also, as discussed above, other courts have applied Lear to explicit contract provisions. See, e.g., Massillon-Cleveland-Akron Sign Co., 444 F.2d at 427. Thus, the explicit contractual provision in the licensing agreement between the IPC and M & M is no barrier to application of the Lear balancing test.[7]
 
 
 28
 We turn now to application of this balancing test to the current dispute. In doing so, we must identify the public interest in certification marks and the public injury that might result from enforcement of the estoppel provision in the contract between M & M and the IPC. The IPC argues, and the district court agreed, that the trademark cases enforcing no-challenge provisions noted above are controlling with regard to certification marks because "certification marks are generally treated the same as trademarks." Levy v. Kosher Overseers Ass'n of America, Inc., 104 F.3d 38, 39 (2d Cir.1997); see also American Bd. of Psychiatry and Neurology, Inc. v. Johnson-Powell, 129 F.3d 1, 3 (1st Cir.1997) ("A registered certification mark receives the same protection as a trademark."). Although we recognize that trademarks and certification marks are "generally treated the same," we conclude that the difference between the public interests in certification marks and trademarks compels a different result in this context.
 
 
 29
 In the trademark context, as already noted, "[a] dealer's good will is protected... in order that the purchasing public may not be enticed into buying A's product when it wants B's product." T & T Mfg., 587 F.2d at 538. Thus, agreements that allow the continued use of confusingly similar trademarks injure the public, and the important issue in litigation over trademark contracts is the public confusion that might result from enforcing the contract. See 15 U.S.C. § 1052(d) (permitting refusal of registration if a mark "so resembles [another] mark ... as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive").
 
 
 30
 Significantly, trademark owners are granted a monopoly over their marks and can choose to license the marks to others on whatever conditions they deem appropriate, so long as confusion does not result. The same is not true of certification marks. Certification mark licensing programs are "a form of limited compulsory licensing," 3 McCarthy on Trademarks and Unfair Competition § 19.96, and the certifier has a "duty ... to certify the goods or services of any person who meets the standards and conditions which the mark certifies." In re University of Mississippi, 1 U.S.P.Q.2d 1909, 1911, 1987 WL 123808 (T.T.A.B.1987).
 
 
 31
 That the owner of a certification mark "cannot refuse to license the mark to anyone on any ground other than the standards it has set," 3 McCarthy at § 19.96, is an important distinction between the policies embodied in trademarks and certification marks. It is true that certification marks are designed to facilitate consumer expectations of a standardized product, much like trademarks are designed to ensure that a consumer is not confused by the marks on a product. See, e.g. Institut Nat'l Des Appellations d'Origine v. Brown-Forman Corp., 47 U.S.P.Q.2d 1875, 1889-90 (T.T.A.B.1998) (holding that same likelihood of confusion test applied in the context of trademarks also applies to certification marks). But the certification mark regime protects a further public interest in free and open competition among producers and distributors of the certified product. It protects the market players from the influence of the certification mark owner, see 15 U.S.C. § 1064(5) (listing grounds for cancellation of a certification mark when the neutrality of the rights holder is compromised), and aims to ensure the broadest competition, and therefore the best price and quality, within the market for certified products. See 15 U.S.C. § 1064(5)(D) (permitting cancellation of any certification mark owned by a registrant who "discriminately refuses to certify or to continue to certify the goods or services of any person who maintains the standards or conditions which such mark certifies"). From our review of the cases, it appears to us that this interest is akin to the public interest in the "full and free use of ideas in the public domain" embodied in the patent laws. Lear, 395 U.S. at 674, 89 S.Ct. 1902.
 
 
 32
 We believe that the estoppel provision in the contract between M & M and the IPC injures this public interest in a number of ways. First, the provision places a non-quality-control related restriction on the sellers of the certified product and other licensees that benefits the mark owner in contravention of the mark owner's obligation not to interfere with a free market for products meeting the certification criteria. Second, as in Lear, parties that have entered into a licensee relationship with the IPC may often be the only individuals with enough economic incentive to challenge the IPC's licensing scheme, and thus the only individuals with enough incentive to force the IPC to conform to the law. See id. at 670, 89 S.Ct. 1902.
 
 
 33
 Finally, to decide the issue of public injury we must look to the public interest implicated by the merits of the licensee's challenges. See, e.g., Beer Nuts, 477 F.2d at 328 (looking to merits of licensee's case and finding that enforcement of no-challenge provision would "impede the efficacy of the defense that the words are merely descriptive," but enforcing the contract because no likelihood of confusion existed). M & M alleges, among other things, that: (1) the IPC is a corporate entity dominated by producers of the certified products and that such domination violates the provisions in 15 U.S.C. § 1064(5)(B); (2) the IPC uses the goodwill derived from the certification marks as a trademark in violation of § 1064(5)(C); (3) the IPC imposes certification standards other than those that the certification mark is registered to certify in violation of § 1064(5)(D); and (4) the IPC discriminately refuses to certify potatoes that meet the standards for certification, also in violation of § 1064(5)(D). All of these challenges implicate the public interest in maintaining a free market for the certified product unaffected by the possible competing economic interests of the certification mark owner.
 
 
 34
 We believe these public interests are more substantial and more likely to be harmed if M & M is not allowed to press its claims than the public interests and de minimis harm alleged in the trademark-related cases that upheld contractual no-challenge provisions. See, e.g., Beer Nuts, 477 F.2d at 329 (holding that public interest in guarding against depletion of general vocabulary insufficient to override contract law); T & T Mfg., 587 F.2d at 539 (holding likelihood of confusion not significant); Times Mirror, 103 F.Supp.2d at 738 (finding that no public injury had been demonstrated). Also, this case lacks a strong countervailing public interest other than the general interest in enforcing written contracts (like the interest in settlements) that persuaded courts to enforce contractual no-challenge provisions in other agreements. See, e.g., Flex-Foot, 238 F.3d at 1368. We therefore conclude that the district court erred in finding M & M contractually estopped as a matter of law from challenging the IPC marks. We express no view as to whether on remand M & M will be able to prove its counterclaims for cancellation of the marks. We hold only that M & M is not estopped from making and attempting to prove such claims in the first instance.
 
 
 35
 2. M & M's Other Arguments on its Cross-appeal
 
 
 36
 M & M also argues that the district court erred in its August 1998 Order by failing to grant M & M's motion for summary judgment on the merits of its challenge to the IPC marks. The district court did consider the merits of the joint summary judgment motion and ostensibly directed its holding to the "Packer Parties," which the court had defined to include M & M. However, the court's ruling on the merits[8] could not properly have been applied to M & M because the court had earlier in the same opinion held that M & M was estopped from challenging the IPC marks altogether. The court later made clear that for this reason it never intended to allow M & M to proceed at all with its counterclaims.[9] Thus, the court's holding denying summary judgment on the merits and limiting the issues for trial was in fact directed solely at Majestic, whose claims against the IPC were able to proceed to trial because it had not entered into a licensing agreement with the IPC. We therefore decline M & M's request to decide whether the district court erred on the merits of a summary judgment ruling that was not applicable to M & M and is not part of the appeal before this court. On remand, the court is free to consider motions for summary judgment by either party and otherwise allow the case to proceed in its normal course.
 
 
 37
 M & M also argues on appeal that the IPC's licensing scheme violates the First Amendment. We need not consider the merits of this claim, however, because it is not properly before us. M & M did not include this claim in its initial answer (filed in 1998) to the IPC's complaint. In August 2001, M & M moved to file an Amended Answer and Counterclaims that would have included the First Amendment claims. However, the district court denied the motion. Consequently, this issue was never part of the case and the district court never ruled on the merits. Although M & M could have challenged on appeal the district court's denial of its motion to amend, it chose instead to argue the First Amendment issue to us on the merits as a reason for not enforcing the IPC's licensing scheme. That latter issue is simply not before us.
 
 
 38
 Finally, M & M argues that the district court abused its discretion by failing to award M & M attorneys' fees as the "prevailing party" in an "exceptional case[]" under the Lanham Act. See 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."). We find no error in the district court's decision regarding attorney's fees at this stage in the litigation, much less error that would amount to an abuse of discretion. However, it is impossible for us to determine on this record whether M & M will be a prevailing party on remand, and, if so, whether this case should be properly regarded as "exceptional." We therefore cannot decide whether M & M will be entitled to attorneys' fees if it prevails on its counterclaims. M & M is free to raise this issue in the district court should the disposition of this case change on remand.
 
 B. The IPC's Appeal
 
 39
 We turn now to the IPC's appeal from the May 2002 Order vacating the jury award of $41,962 in its favor. The IPC contends that the district court erred in holding that monetary damages were not proper in this case. It argues that the district court erroneously utilized a per se rule that absent counterfeiting a licensor of a certification mark may never recover profits from an infringing licensee. We have doubts as to whether such a per se rule could withstand judicial scrutiny on appeal. However, we do not believe the IPC's reading of the district court's May 2002 Order is the only plausible one. Much of that opinion is devoted to the equitable reasons for denying relief in the form of monetary damages, a power which undeniably lies in the discretion of the district court. See 15 U.S.C. § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."). Due to the ambiguity in the opinion as to whether or not the district court was utilizing a per se rule and because the issue of the validity of such a rule might become moot if the district court ultimately finds for M & M on the merits of its challenge to the IPC marks, we believe it wise to refrain from deciding that issue today. We are remanding this case back to the district court in any event, and the district court should have the opportunity, if necessary, to clarify the basis of its holding on damages.
 
 III. Conclusion
 
 40
 For the reasons given above, we therefore vacate the district court's August 1998 Order holding M & M estopped as a matter of law from bringing its counterclaims for cancellation of the IPC marks and remand for consideration of those claims on the merits. On remand, the district court should also clarify its May 2002 Order regarding damages if the M & M counterclaims fail on the merits.
 
 
 
 Notes:
 
 
 [1]
 "A certification mark is a special creature created for a purpose uniquely different from that of an ordinary trademark or service mark. It is a mark owned by one person and used by others in connection with their goods or services to certify quality, regional or other origin." 3 McCarthy on Trademarks and Unfair Competition § 19.91
 
 
 [2]
 There appears to have been some confusion between the parties and the district court even after the court's August 1998 Order as to whether M & M would be able to pursue at trial its counterclaims challenging the IPC marks. In January 1999, the court reaffirmed its holding that M & M was estopped by its licensing agreement. Finally, in an October 2001 ruling on M & M's motion for clarification or reconsideration, the court made clear that "[d]efendants may not challenge the validity of the certification marks at trial." For our purposes, we refer to the court's August 1998 Order as the definitive discussion and decision on this issue
 
 
 [3]
 Purchasers of small five- and ten-pound consumer bags of potatoes are exempt from the licensing requirement
 
 
 [4]
 M & M explained that the records had been destroyed in a 1993 fire in Matthew Rogowski's office
 
 
 [5]
 The district court's holding on estoppel also applied to Hapco. However, because Majestic had not entered into a licensing agreement with the IPC, the court considered the merits of the joint motion for summary judgment on the challenges to the IPC marks. In doing so, the court denied summary judgment on the merits, but held that Majestic could proceed to trial on those claims with certain limitations. As will be seen below in Part II.A.2., the court's holding with regard to the merits was only applicable to Majestic
 
 
 [6]
 A number of district court cases in this circuit have also applied this rule. SeeTimes Mirror Magazines, Inc. v. Field & Stream Licenses Co., 103 F.Supp.2d 711, 738 (S.D.N.Y. 2000) ("In the absence of significant injury to the consuming public, a party entering into a settlement agreement with respect to a trade mark will be held to its contract."); Marshak v. Green, 505 F.Supp. 1054, 1060-61 (S.D.N.Y.1981) ("Courts adhere to traditional common-law contract principles even in trademark cases as long as holding a party to his obligations is not inconsistent with the public policy of preventing confusion and deception as to the origin of goods or services."); Peyrat v. L.N. Renault & Sons, Inc., 247 F.Supp. 1009, 1014 (S.D.N.Y. 1965) (holding that although "parties to a trademark controversy may contract between themselves for any legal purpose," those contracts are only enforceable "so long as no injury is caused to the public").
 
 
 [7]
 The IPC also briefly contends that a prior decision of this court is binding precedent on the estoppel issue. InHapco Farms, Inc. v. Idaho Potato Commission, 238 F.3d 468 (2d Cir.2001) (per curiam), this court heard an appeal in one of the cases that had been consolidated with this one for pre-trial purposes. Hapco's complaint against the IPC had been dismissed by the district court on the ground of sovereign immunity, Idaho Potato Comm'n v. M & M Produce Farms & Sales, 95 F.Supp.2d 150 (S.D.N.Y.2000), and this court affirmed. 238 F.3d at 468. The IPC now informs us that Hapco argued in that appeal that the district court erred in barring Hapco from challenging the IPC's marks on the basis of estoppel. In affirming the district court, this court did not specifically mention the estoppel issue, but did state that "[w]e have considered all of Hapco's contentions on this appeal and have found in them no basis for reversal." Id. The IPC argues that this was a decision on the merits of the estoppel issue and is applicable to M & M. We disagree. We are not at all sure that a prior decision of this court in another case can create binding precedent for us on this issue when that decision does not mention the issue or the underlying facts. Further, an independent review of the briefs to this court in that appeal reveals that although Hapco argued that certification marks should be treated differently from trademarks, it did not cite the leading case of Lear, which provides the framework for our analysis today. Most importantly, in bringing the Hapco case to our attention, the IPC fails to mention an important fact that it relied on in the prior appeal and that distinguishes Hapco's claims from those of M & M: The IPC and Hapco had settled an earlier dispute by entering into a consent order in which Hapco specifically acknowledged the validity of the IPC marks. As our discussion in this opinion makes clear, this is the very type of countervailing interest that could lead a court to enforce estoppel when applying the Lear balancing test. Thus, the Hapco case is clearly distinguishable and could not serve as binding precedent on us.
 
 
 [8]
 See supra note 5
 
 
 [9]
 See supra note 2