**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE STATE OF IDAHO POTATO
COMMISSION,
            *Plaintiff-Appellee,*

v.

G&T TERMINAL PACKAGING, INC.,
            *Defendant-Appellant.*

No. 04-35229

D.C. No.
CV 98-0088 DOC

THE STATE OF IDAHO POTATO
COMMISSION,
            *Plaintiff-Appellant,*

v.

G&T TERMINAL PACKAGING, INC.,
            *Defendant-Appellee.*

No. 04-35238

D.C. No.
CV 98-0088 DOC

OPINION

Appeals from the United States District Court
for the District of Idaho
David O. Carter, District Judge, Presiding

Argued and Submitted
July 13, 2005—Seattle, Washington

Filed October 7, 2005

Before: A. Wallace Tashima, Richard A. Paez, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Tashima

13917

**COUNSEL**

Michael S. Gilmore, Deputy Attorney General (Idaho), Boise, Idaho, for the plaintiff-appellant and cross-appellee.

Richard C. Boardman, Perkins Coie LLP, Boise, Idaho, for the defendant-appellee and cross-appellant.

**OPINION**

TASHIMA, Circuit Judge:

In its appeal, the Idaho Potato Commission ("IPC") challenges the district court's ruling that a no-challenge provision in its certification mark licensing agreement with G&T Terminal Packaging ("G&T") is unenforceable. G&T appeals several damages awards to IPC for breach of contract and violation of the Lanham Act, as well as an award of attorney's fees and costs. We have jurisdiction over these appeals pursuant to 28 U.S.C. § 1291.

Agreeing with the Second Circuit in *Idaho Potato Commission v. M&M Produce Farms & Sales*, 335 F.3d 130 (2d Cir.

2003) (*M&M III*), *cert. denied*, 541 U.S. 1027 (2004), we hold that the no-challenge provision in IPC's licensing agreement is unenforceable. We also affirm the district court's $1 and $100,000 damages awards to IPC. We reverse, however, the $50,000 contract damages award to IPC, and vacate the award of attorney's fees and costs to IPC and remand those matters to the district court for reconsideration in light of our limited reversal.

## FACTS AND PROCEDURAL BACKGROUND

IPC is a statutorily-created agency of the State of Idaho formed for the purpose of promoting Idaho potatoes. *See Hapco Farms, Inc. v. Idaho Potato Comm'n*, 238 F.3d 468 (2d Cir. 2001). IPC finances its promotional work in part by licensing several certification marks for Idaho potatoes including "Idaho" and "Grown in Idaho." G&T is a wholesale distributor of potatoes. Beginning in 1968, G&T entered into a series of licenses with IPC to use IPC's certification marks. The most recent of these licenses expired on September 1, 1998. This license contained provisions in which G&T recognized the validity of IPC's marks and agreed not to challenge IPC's rights in the marks while the license was in effect or after its expiration.

In February 1998, IPC filed this action in the United States District Court for the District of Idaho against G&T. IPC alleged that G&T had breached its licensing agreement and infringed IPC's certification marks by, *inter alia*, failing to keep adequate records and using unlicensed potato repackers. In July 1998, G&T filed a complaint in intervention in three consolidated cases involving IPC and potato wholesalers in the United States District Court for the Southern District of New York. G&T's complaint in intervention alleged that IPC's certification marks were unenforceable and subject to cancellation under the Lanham Act. The New York district court stayed further proceedings in IPC's Idaho case against G&T pending resolution of the issues raised in G&T's com-

plaint. The New York court eventually dismissed G&T's claims, concluding that the Eleventh Amendment shielded IPC from suit.[1] *M&M II*, 95 F. Supp. 2d at 156.

After dismissal of G&T's New York action, this Idaho case was reactivated in March 2001. IPC added a breach of contract claim based on G&T's New York complaint, alleging that G&T had violated the no-challenge clause in its license and seeking to recover IPC's costs in defending the suit. The Idaho district court granted partial summary judgment for IPC, concluding that G&T had breached the licensing agreement as a matter of law. It denied summary judgment on the issue of damages, however, determining that an issue of fact remained as to the amount IPC spent defending against G&T's claims. In April 2003, the remaining issues in the case proceeded to trial.

On July 11, 2003, after trial but before the district court rendered judgment, the Second Circuit issued a decision holding the no-challenge provision of IPC's license agreement unenforceable. *M&M III*, 335 F.3d at 139. Based on *M&M III*, G&T moved for reconsideration of the district court's ruling that G&T's New York complaint breached the no-challenge provision of its licensing agreement. The district court granted G&T's motion, and elected to follow *M&M III*. It thus vacated its previous grant of summary judgment to IPC on that issue.

In October 2003, the district court awarded IPC: (1) $1 as a result of G&T's violation of an IPC rule requiring that Idaho

---

[1]The New York district court had earlier held that the no-challenge clause in G&T's license estopped it from challenging the validity of IPC's federal marks. *Idaho Potato Comm'n v. M&M Produce Farm & Sales*, 35 F. Supp. 2d 313, 323 (S.D.N.Y. 1999) (*M&M I*). The court in effect vacated this ruling by holding that the Eleventh Amendment precluded G&T's suit. *Idaho Potato Comm'n v. M&M Produce Farm & Sales*, 95 F. Supp. 2d 150, 156 (S.D.N.Y. 2000) (*M&M II*), *aff'd sub nom. Hapco Farms, Inc. v. Idaho Potato Comm'n*, 238 F.3d 468 (2d Cir. 2001).

potato packaging identify the variety of potatoes contained therein; (2) $50,000 as a result of G&T's failure to preserve all of its records of sales and purchases of Idaho potatoes in violation of its licensing agreement; (3) statutory damages of $100,000 for G&T's violation of the Lanham Act by purchasing bags with IPC's certification mark on them and using them to package potatoes after G&T's license to use the mark had expired; and (4) IPC's costs. IPC later requested an award of attorney's fees pursuant to the license agreement and G&T made a motion to amend the court's findings and conclusions and to alter or amend the judgment. The court denied G&T's motion and awarded IPC 40 percent of its requested attorney's fees.

## ANALYSIS

IPC challenges the district court's ruling that the no-challenge provision in its licensing agreement is unenforceable. G&T contests the propriety of each of the court's damages awards and its award of IPC's attorney's fees and costs.

## I.   IPC's No-Challenge Provision

IPC asks us to disagree with *M&M III* and hold the no-challenge provision in its licensing agreement enforceable. G&T argues that issue preclusion bars IPC from litigating the issue in this court and that, in the event we reach the merits of the dispute, we should adopt the Second Circuit's approach.

### A.   *Issue Preclusion*

G&T relies on the doctrine of issue preclusion, or collateral estoppel, to argue that *M&M III* bars IPC from relitigating the issue of whether the no-challenge provision is enforceable.[2]

---

[2]As G&T points out, although a defendant generally must plead issue preclusion as an affirmative defense in the district court, the Second Cir-

Issue preclusion can apply only if: (1) *M&M III* gave IPC a full and fair opportunity to litigate the issue; (2) the issue was actually litigated in *M&M III*; (3) IPC lost on the issue as a result of a final judgment in *M&M III*; and (4) IPC was a party or in privity with a party in *M&M III*. *United States Internal Revenue Serv. v. Palmer (In re Palmer)*, 207 F.3d 566, 568 (9th Cir. 2000). The parties appear to agree that these elements are met.

**[1]** Nonetheless, IPC argues that because it is a state agency it is not subject to issue preclusion on issues of law. In *United States v. Mendoza*, 464 U.S. 154, 162 (1984), the Supreme Court held that nonmutual offensive collateral estoppel[3] did not apply against the federal government so as to preclude relitigation of the issues in that case. Despite the Supreme Court's previous approval of the use of nonmutual offensive collateral estoppel by private litigants, *Mendoza* recognized

cuit issued its *M&M III* decision after the Idaho district court had granted IPC summary judgment on its breach of contract claim. It was only on later reconsideration in light of *M&M III* that the district court held the no-challenge provision unenforceable. G&T thus could not have raised issue preclusion as an affirmative defense. It is therefore permissible for G&T to raise the issue on appeal. *Chew v. Gates*, 27 F.3d 1432, 1437 n.2 (9th Cir. 1994).

[3]Nonmutual collateral estoppel refers to use of collateral estoppel by a nonparty to a previous action to preclude a party to that action from relitigating a previously determined issue in a subsequent lawsuit against the nonparty. *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 320-30 (1971). "Offensive" use of nonmutual collateral estoppel occurs when a plaintiff seeks to prevent a defendant from relitigating an issue that the defendant previously litigated unsuccessfully against a different party. *Mendoza*, 464 U.S. at 159 n.4. "Defensive" use of nonmutual collateral estoppel involves a defendant attempting to preclude a plaintiff from relitigating an issue that the plaintiff previously litigated unsuccessfully against a different party. *Id.* Defendant G&T invokes nonmutual defensive collateral estoppel in an attempt to prevent Plaintiff IPC from relitigating the issue of the validity of its no-challenge license provision because in *M&M III* the Second Circuit determined that IPC could not enforce an identical license provision against a former licensee. *See* 335 F.3d at 139.

that the government differs from private litigants in the geographic breadth of its litigation and in the nature of the issues it pursues. *Id.* at 159-60 ("Government litigation frequently involves legal questions of substantial public importance; indeed, because the proscriptions of the United States Constitution are so generally directed at governmental action, many constitutional questions can arise only in the context of litigation to which the government is a party."). It noted that:

> A rule allowing nonmutual collateral estoppel against the government in such cases would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue. Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari. Indeed, if nonmutual estoppel were routinely applied against the government, this Court would have to revise its practice of waiting for a conflict to develop before granting the government's petitions for certiorari.

*Id.* at 160 (citations omitted).

**[2]** *Mendoza*'s rationale applies with equal force to G&T's attempt to assert nonmutual defensive collateral estoppel against IPC (a state agency). *See Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 689-90 (9th Cir. 2004) (relying on *Mendoza*'s reasoning to conclude, under Idaho state law preclusion principles, that nonmutual offensive collateral estoppel did not preclude a state agency from relitigating a legal issue that had previously been determined against the agency by a state court); *Hercules Carriers, Inc. v. Claimant State of Fla.*, 768 F.2d 1558, 1578-79 (11th Cir. 1985) (applying *Mendoza* to hold that nonmutual defensive collateral estoppel did not operate against a state government). We therefore hold that issue preclusion does not prevent IPC from

challenging the district court's determination that the no-challenge clause of IPC's licensing agreement is unenforceable. Because G&T cannot collaterally estop IPC from relitigating the issue, we go on to assess the validity of IPC's no-challenge provision.

## B.  M&M III

**[3]** In *M&M III*, the Second Circuit held that M&M Produce Farm & Sales ("M&M") could challenge the validity of IPC's certification mark for Idaho potatoes in spite of a no-challenge provision in a licensing agreement between the two. 335 F.3d at 139. M&M's former licensing agreement contained a provision, like the one in G&T's license, in which M&M recognized the validity of IPC's certification marks and promised not to challenge the marks during the license term or after its expiration. *See id.* at 134. M&M sought to challenge the validity of the certification marks nonetheless, arguing that the no-challenge provision was unenforceable because it violated the public policy underlying the Lanham Act. *Id.* The Second Circuit applied the balancing test articulated by the Supreme Court in *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), to determine that the provision should not be enforced. *See M&M III*, 335 F.3d at 135-37.

*Lear* involved a dispute between a patent holder and a licensee who sought to challenge the validity of the patent based upon which it had agreed to pay royalties. 395 U.S. at 655-56. The Court held that licensee estoppel did not preclude the licensee's challenge, overruling a previous decision holding that a licensee operating under a license agreement generally could not simultaneously challenge the validity of the underlying patent. *Id.* at 670-71; *see also Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 836 (1950). The Court reasoned that:

> Surely the equities of the licensor do not weigh very heavily when they are balanced against the important

> public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

*Lear*, 395 U.S. at 670-71. The Court also refused to enforce a provision of the parties' license agreement that would have required the licensee to pay royalties until a court held the patent invalid. *Id.* at 671-74. It noted that:

> The parties' contract, however, is no more controlling on this issue than is the State's doctrine of estoppel, which is also rooted in contract principles. The decisive question is whether overriding federal policies would be significantly frustrated if licensees could be required to pay royalties during the time they are challenging patent validity in the courts.

*Id.* at 673. The *Lear* court thus balanced the policies underlying state contract law against those animating federal patent law in placing limits on the parties' contractual obligations.

In *M&M III*, the Second Circuit noted that courts had frequently applied the *Lear* balancing test to trademark licensing contracts. 335 F.3d at 136. It went on to observe that courts have generally precluded licensee challenges to trademarks after weighing the public interest in trademarks against contract principles. *Id.* (citing *MWS Wire Indus., Inc. v. Cal. Fine Wire Co.*, 797 F.2d 799, 803 (9th Cir. 1986), and *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 329 (6th Cir. 1973)). It

concluded that the trademark cases were not controlling in the certification mark context, however, because the two types of marks serve different public interests. *Id.* at 138.

Trademarks protect the public from confusion by accurately indicating the source of a product. They preserve a producer's good will "in order that the purchasing public may not be enticed into buying A's product when it wants B's product." *Id.* (quoting *T & T Mfg. Co. v. A. T. Cross Co.*, 587 F.2d 533, 538 (1st Cir. 1978)). Trademark owners have a monopoly over their marks, which they can license as they see fit as long as such licensing does not cause public confusion. *Id.* A certification mark, on the other hand, is a mark used by someone other than its owner to signify that a product or service has a certain characteristic. 3 McCarthy on Trademarks and Unfair Competition § 19:91 (4th ed. 2005) ("McCarthy"). The certification mark owner is required to license the mark to anyone who meets the certification criteria. *M&M III*, 335 F.3d at 138 (citing McCarthy § 19:96).

The *M&M III* court observed that the distinction between certification marks and trademarks reflects different underlying public interests. While certification marks resemble trademarks in that they attempt to prevent consumer confusion by communicating information regarding a product's characteristics, certification marks also have another purpose. *Id. M&M III* reasoned that certification marks protect "a further public interest in free and open competition among producers and distributors of the certified product." *Id.* This is achieved by protecting certification mark licensees from the certification mark owner's influence in an attempt to ensure the broadest possible competition in the market for certified goods. *Id.* (citing 15 U.S.C. § 1064(5), which allows cancellation of a certification mark when the owner: produces or markets goods to which the mark is applied; permits use of the mark for purposes other than to certify; or discriminately refuses to certify one who maintains the standards the mark signifies). The court viewed this public interest as "akin to the public interest

in the 'full and free use of ideas in the public domain' embodied in the patent laws." *Id.* at 138-39 (quoting *Lear*, 395 U.S. at 674).

**[4]** The Second Circuit held that IPC could not enforce the no-challenge provision against M&M because the public injury that would result outweighed the general interest in enforcing written contracts. *Id.* at 139. In reaching this conclusion, the court first observed that the provision restricted licensees in a way unrelated to controlling the quality of the certified product. *Id.* This restriction inured to the benefit of IPC in contravention of its duty not to interfere with a free market for Idaho potatoes. *Id.* Next, the court noted that parties having at some point entered into an IPC licensing agreement might be the only ones with sufficient economic incentive to challenge any of IPC's conduct that arguably compromised its neutrality as a certification mark holder. *Id.* Finally, the court looked to the public interest underlying the merits of M&M's challenges. *Id.* It reasoned that M&M's specific allegations regarding violations of IPC's duties as a mark holder implicated the public interest in creating a free market for Idaho potatoes unaffected by IPC's potentially conflicting economic interests. *Id.*

IPC makes three primary contentions in arguing that we should disapprove the district court's reliance on *M&M III*. First, it argues that the policy underlying certification marks mirrors that of trademarks and that *M&M III* therefore erred in treating certification marks differently. Next, it contends that *M&M III* improperly imported into its analysis patent law principles inconsistent with the policies underlying the Lanham Act. Finally, IPC points out that a large number of certification mark holders share its concerns regarding *M&M III*'s holding.

## C.  *Certification Marks Versus Trademarks*

IPC argues that the only certification mark policy reflected in the Lanham Act is that underlying trademarks — the avoid-

ance of public confusion. In its view, *M&M III* should have therefore enforced the no-challenge provision as courts have done in the trademark context.

Certification marks, however, differ from trademarks in a number of significant ways. *See* McCarthy § 19:91 ("A certification mark is a special creature created for a purpose uniquely different from that of an ordinary trademark or service mark."). Certification marks are subject to cancellation if the owner produces or markets goods on which the mark appears, permits use of the mark for purposes other than to certify, or discriminately refuses to certify the goods of one who meets the standards the mark denotes. 15 U.S.C. § 1064(5). The mark holder's duty to license all who qualify makes certification "a form of limited compulsory licensing." McCarthy § 19:96.

**[5]** The Lanham Act makes clear that certification marks serve other public interests in addition to the prevention of public confusion. Its certification mark cancellation provisions illustrate the legislative intent to protect "a further public interest in free and open competition among producers and distributors of the certified product." *M&M III*, 335 F.3d at 138. By requiring certification mark holders to license all individuals who meet the certification criteria, the Lanham Act ensures that the market will include as many participants as can produce conforming goods. By preventing mark holders from becoming market participants, it removes incentives for mark holders to engage in anti-competitive conduct. The Lanham Act's cancellation provisions thus appear designed to promote free competition in the market for certified products.[4] We therefore agree with *M&M III*'s assessment of the policy concerns underlying the Lanham Act's certification mark regime.

---

[4]IPC offers no persuasive argument to the contrary, simply asserting that the Lanham Act's restrictions on certification mark holders serve an anti-confusion purpose but failing to explain why they cannot also encourage free competition.

**[6]** We also find persuasive *M&M III*'s conclusions regarding the relative weight of the pertinent public interests. In *M&M III*, as in this case, IPC sought to enforce a no-challenge provision against a former licensee. Allowing it to do so would enable it to prevent anyone who had ever held an IPC license from challenging its conduct as a certification mark owner. This would likely leave IPC's conduct unchecked by precluding challenges by the only individuals with enough economic incentive to bring them.[5] *See M&M III*, 335 F.3d at 139 ("[P]arties that have entered into a licensee relationship with the IPC may often be the only individuals with enough economic incentive to challenge the IPC's licensing scheme, and thus the only individuals with enough economic incentive to force the IPC to conform to the law." (citing *Lear*, 395 U.S. at 670)). As *M&M III* concluded, the public interest in ensuring free competition in the market for certified goods outweighs IPC's interest in enforcing a contractual provision that would prevent all current and former licensees from challenging its conduct as a certification mark holder.

### D.  **M&M III**'s *Use of Patent Law Principles*

IPC devotes much of its argument to asserting that *M&M III* improperly weighed the public interest underlying patents instead of one underlying certification marks. While *M&M III* analogized the public interest underlying certification marks to that underlying patents, it went on to analyze certification

---

[5]IPC mentions in passing that the Federal Trade Commission is empowered to challenge the validity of certification marks. *See* 15 U.S.C. § 1064. It offers no further analysis, however, and one is left to wonder what resources, if any, the FTC devotes to policing the behavior of certification mark holders. A search of Westlaw's "ALLFEDS" database returns 8 cases containing the terms "certification mark" and "Federal Trade Commission." None of the 8 cases involves an FTC challenge to a certification mark. Similarly, none of the 33 Trademark Trial and Appeal Board decisions containing the term "certification mark" involves challenges by the FTC.

mark policies rooted in the Lanham Act's certification mark provisions. *See* 335 F.3d at 138-39. We thus reject IPC's contention that *M&M III* improperly considered the patent law policy goals articulated in *Lear* instead of those underlying certification mark law.

IPC also contends that *M&M III* should not have applied the *Lear* balancing test at all. It acknowledges, however, that other courts have balanced the public interests in trademark cases involving no-challenge clauses. *See M&M III*, 335 F.3d at 136 (citing *MWS Wire Indus.*, 797 F.2d at 803; *VISA Int'l Serv. Assn. v. Bankcard Holders of Am.*, 784 F.2d 1472, 1473 (9th Cir. 1986); *T & T Mfg.*, 587 F.2d at 538; *Beer Nuts*, 477 F.2d at 329). Because IPC offers no persuasive reason for why it is improper to use *Lear* balancing in Lanham Act cases, we adopt *M&M III*'s approach.

### E.  **M&M III***'s Potential Adverse Effects for Certification Mark Holders*

Finally, IPC summarizes the arguments of 20 certification mark holders who filed a joint *amici curiae* brief in support of IPC's petition for a writ of certiorari in *M&M III*. The *amici*'s arguments restate many of IPC's concerns, with emphasis placed on the increased cost of enforcement *M&M III* will cause for non-profit and governmental certification mark holders. While it may be true that infringement actions will now cost more because licensees and former licensees will often challenge the validity of the mark in question, the *amici*'s arguments fail to address or give any weight to the countervailing public policy concern. Allowing certification mark holders to preclude challenges by all individuals who hold or have held a license would remove what appears to be the principal mechanism for ensuring that mark holders abide by their statutory duties.

[7] We agree with the district court that *M&M III* appropriately balanced the relevant public policies in holding no-

challenge provisions in certification mark licenses unenforce-able. Accordingly, we conclude that the district court did not err in declining to enforce the no-challenge provision against G&T.

## II.  **Damages, Attorney's Fees, and Costs**

The district court initially awarded IPC: $1 in nominal damages because G&T had violated its license by failing to comply with IPC's variety labeling rule; $50,000 as a result of G&T's breach of its license by failing to preserve all of its records of Idaho potato sales and purchases; statutory dam-ages of $100,000 for G&T's violation of the Lanham Act by purchasing and using bags with IPC's certification mark on them after G&T's license to use the mark had expired; and IPC's costs. It later went on to deny G&T's motion for recon-sideration and to award IPC 40 percent of the amount of attor-ney's fees it requested.

G&T challenges all of these awards. First, it argues that the $1 award constitutes an improper civil penalty under Idaho Code § 22-1213. It goes on to contest the $50,000 award as unsupported by the record. It then challenges the $100,000 award as based on an erroneous conclusion that IPC was enti-tled to statutory damages. Finally, it contends that the district court improperly awarded IPC attorney's fees and costs.

G&T appeals from the district court's Findings of Fact and Conclusions of Law and from its denial of G&T's Federal Rule of Civil Procedure 52(b) and 59(e) motion to amend the court's findings and conclusions and to alter or amend the judgment. We review for abuse of discretion the denial of G&T's motion. *See Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1100 (9th Cir. 2004). We review the district court's findings of fact for clear error and its conclusions of law de novo. *Watkins v. Ameripride Servs.*, 375 F.3d 821, 824 (9th Cir. 2004).

## A. *Nominal Damages Award for IPC Rule Violation*

As part of its licensing agreement with IPC, G&T agreed to comply with IPC's rules in general and specifically with its variety labeling rule. The district court found that G&T failed to comply with the variety labeling rule. It went on to hold that G&T's violations were minor and that IPC should therefore recover $1 from G&T. G&T does not dispute that it violated its license by failing to include variety labeling on its packaging.

G&T argues, however, that the district court erred by imposing a $1 civil penalty as a result of the variety labeling violations. This award, it contends, contravenes Idaho Code § 22-1213, which creates civil penalties for violating IPC rules or licensing agreements. In G&T's view, because § 22-1213 requires IPC to provide notice and opportunity for a hearing before IPC assesses civil penalties, it also requires IPC to exhaust its administrative remedies by giving such notice and opportunity before seeking to recover in court for rule violations. *See* Idaho Code § 22-1213(3).

**[8]** As a preliminary matter, § 22-1213 does not by its terms require IPC to exhaust administrative remedies before filing suit. Section 22-1213(1) provides that IPC or its duly authorized agent may assess civil penalties of not more than $1,000 for each offense against any person who violates an IPC rule or licensing agreement. Section 22-1213(3) states that no civil penalty may be assessed unless the person charged was given notice and opportunity for a hearing and that IPC may enforce in district court penalties it is unable to collect administratively. Subsection (3) goes on to state that "[n]othing contained in this section shall be deemed to preclude the commission from pursuing any other civil or criminal remedies available to it as provided by law."

**[9]** The pertinent question is whether § 22-1213 authorizes a court, as opposed to IPC, to impose the civil penalties. As

G&T points out, the statute specifically provides for IPC to assess civil penalties but makes no mention of a court doing so. *See* Idaho Code § 22-1213(1), (3). Section 22-1213 thus does not explicitly empower a court to impose the civil penalties it creates. IPC points to no pertinent authority suggesting that it implicitly does so, and we have found none. We therefore conclude that if civil penalties are to be assessed under § 22-1213, IPC must assess them in administrative proceedings and then enforce them in district court if necessary. The $1 award by the district court therefore cannot be a § 22-1213 civil penalty.

**[10]** The $1 award can, however, constitute nominal damages for breach of contract. Despite the fact that IPC sought civil penalties under § 22-1213, the district court did not indicate reliance on § 22-1213 in imposing the $1 damages award. We thus conclude that the award can be viewed as nominal damages and we affirm the award on that basis.[6]

## B. *Damages Award for Failing to Preserve Records*

The district court awarded IPC $50,000 for G&T's breach of its license by failing to preserve all of its records of Idaho potato sales and purchases. The court found the breach to be relatively serious because of IPC's resulting discovery problems and the attendant discovery disputes involving the court. It did not explain how or why it chose the $50,000 figure.

---

[6]G&T also argues that the $1 award is improper because IPC waived its right to require G&T to comply with its variety labeling rule. G&T points to an October 1997 letter that IPC wrote to G&T warning it against unlicensed use of IPC marks and against using unlicensed repackers and container manufacturers. In G&T's view, by failing to mention that G&T was also required to follow other IPC rules as provided in its license, IPC waived the right to enforce the variety labeling rule against G&T. As IPC points out, G&T offers no authority for the proposition that warning a person about certain legal requirements under a license waives other legal requirements. G&T's waiver argument therefore fails.

G&T argues that the lack of record evidence of damage to IPC resulting from the breach renders the $50,000 an improper contract damages award. It also argues that the award is improper as beyond the scope of the relief sought by IPC. IPC counters that we can uphold the $50,000 award as a discovery sanction or as a civil penalty under Idaho Code § 22-1213, implicitly conceding the lack of support for a contract damages award. It goes on correctly to point out that the district court may award relief not prayed for under Federal Rule of Civil Procedure 54(c). Finally, it argues that we should remand to the district court for further explanation of the $50,000 award in the event that we decide not to affirm the award.

### 1. *Discovery Sanction*

IPC first argues that we can uphold the $50,000 award as a discovery sanction based on G&T's violation of its ongoing duty to preserve evidence. *See Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (observing that a district judge has discretion to impose an appropriate sanction when he or she has determined that a party on notice of its obligation to preserve evidence intentionally destroyed it). While G&T stipulated that it failed to preserve some of its records of sales and purchases of Idaho potatoes, the district court's factual findings contain no indication that G&T intentionally destroyed records with knowledge that those records were relevant to this litigation. *Cf. United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (holding that defendants did not engage in spoliation of evidence when records were intentionally destroyed in accordance with a document retention policy and state regulations before litigation commenced). Our review of the record does not reveal any evidence supporting the conclusion that G&T intentionally destroyed evidence and IPC points to none. The record is thus insufficient to allow us to affirm the award as a discovery sanction.

## 2. *Civil Penalty*

IPC also argues that we can affirm the award as a civil penalty under Idaho Code § 22-1213. As discussed above, § 22-1213 does not authorize a court to impose the civil penalties it creates. We therefore cannot affirm the award as a § 22-1213 civil penalty.

**[11]** Because our review of the record reveals no basis upon which the district court could properly have imposed a damages award of $50,000, we decline IPC's invitation to remand the award for further explanation. Accordingly, we reverse the $50,000 damage award.

## C. *Statutory Damages Award for Violation of the Lanham Act*

**[12]** The district court concluded that G&T violated the Lanham Act by purchasing bags bearing IPC's certification mark and using them to package potatoes after G&T's license to use the mark had expired. It went on to award IPC $100,000 in statutory damages under 15 U.S.C. § 1117(c). Section 1117(c) allows a plaintiff to opt for statutory damages in cases involving the use of a counterfeit mark. 15 U.S.C. § 1117(c). G&T contends that statutory damages were improper in this case, thus raising the question of whether its use of IPC's mark constituted counterfeiting or mere infringement. The district court's determination that G&T's unauthorized use amounted to counterfeiting is a legal conclusion subject to de novo review. *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 921 (9th Cir. 2001).

In order to invoke § 1117's special civil monetary remedies against counterfeiting, IPC must establish that: (1) G&T intentionally used a counterfeit mark in commerce; (2) knowing the mark was counterfeit; (3) in connection with the sale, offering for sale, or distribution of goods; and (4) its use was likely to confuse or deceive. *See* McCarthy § 25:15 (citing 15

U.S.C. §§ 1114(1)(a), 1117(b)). In this context, the mark used by G&T was counterfeit if: (1) it was a non-genuine mark identical to IPC's mark; (2) IPC's mark was registered on the Principal Register for use on the same goods to which G&T applied the mark; (3) IPC's mark was in use; and (4) G&T was not authorized to use IPC's mark on potatoes. *See id.* (citing 15 U.S.C. §§ 1116(d)(1)(B), 1127).

G&T acknowledges that it was using IPC's registered mark on packages of potatoes without a license to do so. The issue of whether its behavior constituted counterfeiting therefore turns on whether its use of IPC's certification mark was likely to cause confusion.

G&T contends that its unlicensed use of IPC's mark was not likely to cause confusion because the potatoes it packaged were genuine Idaho potatoes. It points out that courts have held that the unauthorized sale of genuine goods does not constitute trademark infringement because it does not cause consumer confusion. *See, e.g., NEC Elec. v. CAL Cir. Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987) ("[T]rademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold."). However, many cases have found a likelihood of confusion when a trademark owner was prevented from exercising quality control over the merchandise bearing its mark. *See, e.g., Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107-08 (4th Cir. 1991); *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."). In addition, many courts have held that an ex-licensee's continued use of a trademark is enough to establish likelihood of confusion. *See U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190-92 (6th Cir. 1997) (holding that "proof of continued, unauthorized use of an

original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion,' " noting that many courts have reached this conclusion, and affirming a treble damages award under 15 U.S.C. § 1117(a), which allows a court to assess treble damages in cases of mere infringement); *see also Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983) ("The unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement."). *But see U.S. Structures*, 130 F.3d at 1192 (holding that ex-franchisee's unauthorized use of franchisor's trademark did not constitute counterfeiting for purposes of awarding attorney's fees under 15 U.S.C. § 1117(b)).

In the certification mark context, the mark holder's ability to institute quality controls seems vital if a mark is to serve its purpose. By licensing a party to use the "Idaho" mark, IPC certifies that the party's potatoes meet the standards the mark represents. G&T asserts that its potatoes did meet IPC's quality control standards because G&T procured its potatoes from licensed distributors. It stipulated, however, that it did not keep all of the records that it was required to keep under IPC rules. By depriving IPC of the opportunity to monitor and control quality, G&T created the potential for consumer confusion. *See El Greco*, 806 F.2d at 395 (noting that "the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain"). G&T's use of the certification mark implied that its potatoes had been produced and distributed in accordance with IPC's quality control procedures, and the fact that this was not the case was likely to cause consumer confusion. *See Shell Oil*, 928 F.2d at 108 (noting that use of Shell's mark "implies that the product has been delivered according to all quality control guidelines enforced by the manufacturer" and concluding that the defendant's failure to follow those guidelines gave rise to "a likelihood of customer confusion as to the quality and source of the bulk oil"). If parties use IPC's mark without abiding by

IPC's quality control provisions, as G&T did in this case, the certification mark may lose its value because goods bearing the mark do not consistently meet the standards the mark signifies.

In addition, those making unauthorized use of the mark gain a market advantage by avoiding the expense of record keeping and following IPC's other rules. Because IPC's function is to police its mark, and not to make a profit from the goodwill associated with it as trademark owners do, IPC will have trouble establishing damages when it brings a court action against an unlicensed user. If its only remedy is injunctive relief, as G&T contends should be the case, then there is very little incentive for potato packers and distributors to obtain a license. Thus, the qualities that distinguish a certification mark from a trademark weigh in favor of making § 1117's statutory penalties available in cases like this one, where an ex-licensee intentionally makes unauthorized use of a certification mark.

**[13]** Because G&T's unlicensed use of IPC's certification mark was likely to cause confusion and to undermine the effectiveness of IPC's certification mark licensing regime, we hold that G&T's use constituted counterfeiting. Accordingly, we affirm the district court's award of statutory damages.

## D.  *Attorney's Fees*

The district court awarded IPC attorney's fees of $66,897.60, 40 percent of the requested amount, under the licensing agreement. Idaho law permits attorney's fees awards pursuant to contract provisions. Idaho R. Civ. P. 54(e)(1). We review for abuse of discretion an award of attorney's fees under state law. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003). The license agreement provides that IPC is entitled to recover its attorney's fees and costs in any action "to enforce the terms of this agreement, to prosecute a violation of this agreement or Licensor's statutes or

rules, to enjoin Licensee from an infringement of the marks or to recover damages for breach of such agreement or for such infringement. . . ."[7]

G&T argues that IPC's suit was driven by allegations withdrawn at trial regarding G&T misbranding potatoes (that is, selling non-Idaho potatoes in packages identifying them as Idaho potatoes). It contends that these allegations were based on a faulty accounting assessment, absent which IPC would have renewed G&T's license. It asserts that an attorney's fees award is inequitable under these circumstances.[8] IPC counters that G&T's failure to keep adequate records and its use of an unlicensed repacker gave IPC independent grounds to bring suit and to refuse to renew G&T's license. It also points out that "self-help" use of a mark is not an appropriate remedy for one improperly deprived of its use. *See* McCarthy § 25:31.

In its finding as to the amount of the award, the district court stated:

> However, as alluded to earlier, the Court finds that it would be inequitable to award Plaintiff all attorney's fees incurred in this action. Plaintiff was successful on a number of claims, but it was also unsuccessful in a number of others. From the information before the Court, it appears that the unsuccessful claims were in many ways the more costly claims in terms of attorney time. After a review of the fee request documents and consideration of the conduct in and outcome of the case, the Court finds

---

[7]Although not expressly so stated in the license agreement, presumably, IPC is entitled to recover its attorney's fees only if it prevails in the action. This implicit condition is not contested on this appeal.

[8]G&T also argues without citation that the attorney's fee provision of the licensing agreement places an unreasonable restriction on the use of certification marks in contravention of IPC's duty not to discriminate in licensing its mark. It fails to explain how such a general license contract provision constitutes a discriminatory refusal to license.

that an award of 40% of the requested attorney's fee amount would be equitable and appropriate.

**[14]** As indicated above, we have reversed the damages award of $50,000 for breach of the license agreement as unsupported by the record. From the court's general finding (and lack of specific allocation), we are unable to tell how much of the attorney's fees award was based on the now reversed $50,000 breach of the license agreement claim. We therefore vacate the attorney's fees award and remand to permit the district court to reconsider the amount of that award in light of these changed circumstances.

### E.  *Costs*

The district court awarded IPC its full costs "as it is clearly the prevailing party in this action." *See* Fed. R. Civ. P. 54(d)(1) ("[C]osts other than attorneys' fees shall be allowed as of course to the prevailing party."). We review for abuse of discretion an award of costs to a prevailing party pursuant to Rule 54(d). *See Save Our Valley v. Sound Transit*, 335 F.3d 932, 944 (9th Cir. 2003). Rule 54(d)(1) creates a presumption in favor of awarding costs to a prevailing party, requiring the losing party to show why costs should not be awarded. *Id.* at 944-45.

**[15]** G&T contends that IPC should not be considered the prevailing party because it did not win on all of its claims. Again, just as with the award of attorney's fees, we cannot tell the extent to which our reversal of the breach of contract claim might affect the district court's prevailing party calculus. We therefore vacate and remand the award of full costs to IPC for the district court's reconsideration.

### CONCLUSION

We affirm the district court's ruling that the no-challenge provision in IPC's licensing agreement is unenforceable. We

also affirm the $1 damages award and the $100,000 statutory damages award under the Lanham Act. We reverse, however, the $50,000 award for breach of the license agreement as unsupported by the record. We also vacate the award of attorney's fees and costs, and remand those matters to the district court for its reconsideration in light of this opinion. Each party shall bear its own costs on appeal.

**AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED.**