# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM SYVERSON, individually,
and on behalf of others similarly
situated; RUTH ALICE BOYD,
individually, and on behalf of
others similarly situated; DALE
CAHILL, individually, and on behalf
of others similarly situated; JACK
FRIEDMAN, individually, and on
behalf of others similarly situated;
PAUL GROMKOWSKI, individually,
and on behalf of others similarly
situated; SYLVIA JONES,
individually, and on behalf of
others similarly situated; ROLF
MARSH, individually, and on behalf
of others similarly situated;
WALTER MASLAK, individually, and
on behalf of others similarly
situated; JAMES PAYNE,
individually, and on behalf of
others similarly situated; ANTONIO
RIVERA, individually, and on
behalf of others similarly situated,
　　　　　*Plaintiffs-counter-*
　　　　　*defendants-Appellants,*

　　　　　　v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION,
　　　　　*Defendant-counter-*
　　　　　*claimant-Appellee.*

No. 04-16449

D.C. No.
CV-03-04529-RMW

ORDER AND
AMENDED
OPINION

61

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, District Judge, Presiding

Argued and Submitted
April 4, 2006—San Francisco, California

Filed August 31, 2006
Amended January 3, 2007

Before: Marsha S. Berzon, Johnnie B. Rawlinson, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Berzon

**COUNSEL**

Jeffrey N. Young and Patrick N. McTeague, McTeague, Higbee, Case, Cohen, Whitney & Toker, Topsham, Maine, for the appellants.

Jeffrey D. Wohl and Katherine L. Kettler, Paul, Hastings, Janofsky & Walker LLP, San Francisco, California, for the appellee.

**ORDER**

The panel has voted to deny appellee's petitions for rehearing and for rehearing en banc. The full court has been advised

of the petitions, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The opinion filed August 31, 2006, slip. op. 10533, and published at 461 F.3d 1147 (9th Cir. 2006) is hereby amended as follows:

1.  Replace <putative class action> with <putative collective action> in the first paragraph of page 10539 of the slip opinion, in footnote 2 on page 10539, and in the second paragraph of page 10547.

2.  In the last paragraph of page 10549 of the slip opinion, replace <as compared to a putative class action> with <as compared to a putative collective or class action>, replace <a later class action> with <a later collective or class action>, and replace <later-brought class action> with <later-brought collective or class action>.

3.  Delete <the award of $27,500 to IBM on its counterclaim is vacated> from the last sentence of the opinion.

No further petitions for rehearing will be entertained.

---

## OPINION

BERZON, Circuit Judge:

Under the Older Workers Benefit Protection Act ("OWBPA"), employees may not waive rights or claims arising under the Age Discrimination in Employment Act ("ADEA") unless the waiver is "knowing and voluntary." 29 U.S.C. § 626(f)(1) (2000). To qualify as "knowing and voluntary," a waiver included in an agreement between an employer and its employees must, among other things, be "written in a manner calculated to be understood" by the aver-

age employee eligible to participate in the agreement. *Id.* § 626(f)(1)(A). This appeal presents the question whether a waiver form used by International Business Machines Corp. ("IBM") in connection with a severance benefit package meets that standard. We hold that it does not and was therefore not "knowing and voluntary." *Id.* § 626(f)(1).

I.

In January 2001, IBM began a reduction in its workforce. As part of its workforce reduction plan, IBM offered each employee selected for termination severance pay and certain benefits in exchange for signing a document entitled "Microelectronics Resource Action (MERA) General Release and Covenant Not To Sue" ("MERA Agreement").[1] Along with the MERA Agreement, IBM issued each selected employee a lengthy document entitled "Microelectronics Division Resource Action Employee Information Package" ("Information Package"), which details the job titles, ages, and numbers of those employees selected and those not selected for termination from various IBM divisions.

Appellants ("the employees")[2] are former IBM employees, each of whom signed the MERA Agreement, or a similar agreement, receiving in return severance pay and benefits. Based on the data contained in the Information Package, these employees filed charges of age discrimination with various state authorities and with the Equal Employment Opportunity Commission ("EEOC"). The EEOC dismissed all charges,

---

[1]The record also contains a later-distributed agreement entitled "Microelectronics Division Resource (MDRA) General Release and Covenant Not To Sue" ("MDRA Agreement"). The MDRA Agreement is, for the purposes of our analysis, indistinguishable from the earlier-distributed MERA Agreement.

[2]Appellants are the named plaintiffs who filed this putative collective action: William Syverson, Ruth Alice Boyd, Dale Cahill, Jack Friedman, Paul Gromkowski, Sylvia Jones, Rolf Marsh, Walter Maslak, James Payne, and Antonio Rivera.

issuing each employee a "Notice of Right To Sue" along with a letter stating that the language of the MERA Agreement satisfies the OWBPA's minimum requirements for "knowing and voluntary" waiver of ADEA rights and claims and is enforceable, thus depriving the employees of their right to pursue their age discrimination claims. The employees then filed this putative collective action in federal court alleging that the MERA Agreement violates the waiver requirements of the OWBPA and that IBM's layoff program constitutes age discrimination in violation of the ADEA.[3] The employees' OWBPA cause of action challenged the MERA Agreement's use of both a release covering ADEA claims and a covenant not to sue excepting them, the pairing of which allegedly caused confusion over whether ADEA claims were excepted from the release.

IBM filed a counterclaim seeking relief for the plaintiffs/employees' breach of the agreements and, predicated thereon, a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

The district court entered an order granting IBM's motion to dismiss the complaint with prejudice. The parties then stipulated to entry of judgment holding the employees jointly and severally liable on IBM's counterclaim and awarding IBM $27,500.

In dismissing the employees' claims, the district court determined that the MERA Agreement was "written in a manner calculated to be understood by an average individual selected by IBM for employment termination," and was "knowing and voluntary" under the OWBPA. In so holding, the district court cited to *Thomforde v. International Business Machines Corp.*, 304 F. Supp. 2d 1143 (D. Minn. 2004)

---

[3]The employees also alleged violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, but they do not appeal the district court's dismissal of that cause of action.

(*Thomforde I*), a single plaintiff action against IBM, in which the Minnesota district court found on summary judgment that an IBM contract, the "Server Group Resource Action (SGRA) General Release and Covenant Not To Sue" ("SGRA Agreement") — for present purposes, identical to the MERA Agreement — satisfied the OWBPA requirement that waiver of any ADEA right or claim be "written in a manner calculated to be understood" by the average individual. *See id.* at 1144-45. The employees here now appeal the waiver-based dismissal of their case.

After this appeal was fully briefed but before oral argument, the Eighth Circuit reversed the Minnesota district court's grant of summary judgment in favor of IBM, holding that the SGRA Agreement "is not written in a manner calculated to be understood by the intended participants as required by the OWBPA." *Thomforde v. Int'l Bus. Machs. Corp.*, 406 F.3d 500, 504 (8th Cir. 2005) (*Thomforde II*).[4] The employees maintain (1) that under the doctrine of offensive nonmutual issue preclusion, the Eighth Circuit's ruling is preclusive of an independent determination by this court of the waiver issue and (2) alternatively, that the MERA Agreement does not satisfy the OWBPA's "manner calculated" requirement.

## II.

We review de novo a district court's grant of a Rule 12(b)(6) motion to dismiss. *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004); *Spink v. Lockheed Corp.*, 125 F.3d 1257, 1260 (9th Cir. 1997). Upon review, we "must construe the complaint in the light most favorable to the plaintiff and must accept all well-pleaded factual allegations as true." *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). "We also review de novo questions of statutory

---

[4]On June 16, 2005, the Eighth Circuit denied IBM's request for rehearing and rehearing en banc.

interpretation." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719 (9th Cir. 2003).

### III.

### A.

**[1]** Added as a collection of discrete amendments to the Age Discrimination in Employment Act ("ADEA") in 1990, the Older Workers Benefit Protection Act ("OWBPA"), Pub. L. No. 101-433 (codified at 29 U.S.C. §§ 621, 623, 626, & 630), imposes, in relevant part, mandatory requirements for waivers of ADEA rights and claims, *see* 29 U.S.C. § 626(f), to ensure that "older workers are not coerced or manipulated into waiving their rights to seek legal relief under the ADEA," *see* S. REP. NO. 101-263, at 5 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 1509, 1510; *see also Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427 (1998) ("[The OWBPA] is designed to protect the rights and benefits of older workers. The OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers."). Under the OWBPA, "[a]n employee 'may not waive' an ADEA claim unless the employer complies with the statute." *Oubre*, 522 U.S. at 427. To this end, "[t]he OWBPA sets up its own regime for assessing the effect of ADEA waivers, separate and apart from contract law. . . . [and] creates a series of prerequisites for knowing and voluntary waivers." *Id.*

**[2]** Section 626(f), part of the OWBPA, sets forth specific requirements for a "knowing and voluntary" waiver.[5] Of pri-

(Text continued on page 72)

---

[5]Section 626(f), in relevant part, provides:

(1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum —

(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated

to be understood by such individual, or by the average individual eligible to participate;

(B) the waiver specifically refers to rights or claims arising under this chapter;

(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or

(ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;

(H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to —

   (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

   (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

mary importance here is the requirement that a waiver be part of an agreement "between the individual and the employer that is written in a manner calculated to be understood by [the] individual, or by the average individual eligible to participate" in a workforce reduction plan. 29 U.S.C. § 626(f)(1)(A).[6] Also relevant to this case is the requirement that the selected employee or employees "[be] advised in writing to consult with an attorney prior to executing the agreement." *Id.* § 626(f)(1)(E). When a dispute arises over whether the requirements of § 626(f) are met, the party asserting the validity of the waiver bears the burden of proof. *Id.* § 626(f)(3).

**[3]** To satisfy the "manner calculated" requirement, "[w]aiver agreements must be drafted in plain language geared to the level of understanding of the individual party to the agreement or individuals eligible to participate" in a group termination plan. 29 C.F.R. § 1625.22(b)(3) (2005). Employers are thus instructed to "take into account such factors as the level of comprehension and education of typical participants." *Id.* These considerations "usually will require the limitation or elimination of technical jargon and of long, complex sentences." *Id.*[7]

---

29 U.S.C. § 626(f)(1).

[6]The somewhat awkward language of this subsection is intended to reach both individually tailored termination plans, which allow arms-length negotiations between the employer and the terminated employee, and termination plans "targeted at groups of employees," which normally do not allow for any negotiation of terms. *See* S. REP. NO. 101-263, at 32, *as reprinted in* 1990 U.S.C.C.A.N. 1509, 1537.

[7]The statute sets up the minimum requirements that must be satisfied before a waiver is found "knowing and voluntary." However, "[o]ther facts and circumstances may bear on the question of whether a waiver is knowing and voluntary, as, for example, if there is a material mistake, omission, or misstatement in the information furnished by the employer to an employee in connection with the waiver." 29 C.F.R. § 1625.22(a)(3). Indeed, "[t]he waiver agreement must not have the effect of misleading, misinforming, or failing to inform participants and affected individuals. [And] [a]ny advantages or disadvantages described shall be presented

As developed in greater detail below, the employees dispute, as they did before the district court, whether the MERA Agreement satisfies the "manner calculated" requirement of § 626(f)(1)(A).

### B.

In *Thomforde II*, the Eighth Circuit considered the precise question we are asked to determine here, holding that "the release of claims signed by Thomforde as part of IBM's involuntary termination program did not satisfy the statutory waiver requirements of the [OWBPA], 29 U.S.C. § 626(f)." 406 F.3d at 501. In addition to parsing the language of the SGRA Agreement, the court noted in its recitation of facts that:

> Prior to signing the Agreement, Thomforde asked his supervisor, Andrew Schram, if the exception for ADEA claims contained in the covenant not to sue meant that he could sue IBM if the case was limited to claims under the ADEA. Schram told Thomforde that he would contact IBM's legal department.

without either exaggerating the benefits or minimizing the limitations." *Id.* § 1625.22(b)(4); *see also* S. REP. No. 101-263, at 31, *as reprinted in* 1990 U.S.C.C.A.N. 1509, 1537 ("[W]aivers not supervised by the EEOC may be valid and enforceable if they meet certain threshold requirements and are *otherwise* shown to be knowing and voluntary." (emphasis added)).

Although this circuit has not addressed the question, other circuits apply a "totality of the circumstances" test to determine whether a particular waiver is "knowing and voluntary." This further inquiry is necessary, however, only if the minimum statutory requirements are met. *See, e.g.*, *Kruchowski v. Weyerhaeuser Co.*, 423 F.3d 1139, 1142 (10th Cir. 2005); *Wastak v. Lehigh Valley High Network*, 342 F.3d 281, 294 n.8 (3d Cir. 2003); *Griffin v. Kraft Gen. Foods, Inc.*, 62 F.3d 368, 373-74 (11th Cir. 1995) (per curiam). As we conclude that the MERA Agreement does not satisfy the threshold statutory requirements, we have no occasion to determine whether the "totality of the circumstances" inquiry is the proper one where those requirements are met.

> Schram later sent Thomforde an e-mail stating "Regarding your question on the General Release and Covenant Not to Sue, the wording is as intended by IBM. The site attorney was not comfortable providing an interpretation for you and suggested you consult with your own attorney." After meeting with his attorney to review the Agreement, Thomforde concluded that he could sign the Agreement and still pursue his claims of age discrimination as long as they were limited to ADEA claims.

*Id.* at 502 (citation omitted). The *Thomforde II* panel concluded that "[g]iven the lack of clarity in the Agreement, *and* IBM's declination to tell Thomforde what it meant by the language, we hold that the Agreement is not written in a manner calculated to be understood by the intended participants as required by the OWBPA." *Id.* at 504 (emphasis added).

## C.

**[4]** Seeking to capitalize on *Thomforde II*, the employees argue for the application of offensive nonmutual issue preclusion,[8] which prevents "a defendant from relitigating the issues which a defendant previously litigated and lost against another plaintiff." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979); *see State of Idaho Potato Comm'n v. G &*

---

[8]"Rather than using the terms 'res judicata' and 'collateral estoppel,' the Supreme Court has [in recent years generally] used the terms 'claim preclusion' and 'issue preclusion,' " *Frank v. United Airlines, Inc.*, 216 F.3d 845, 850 n.4 (9th Cir. 2000) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984)), a practice we follow in this opinion.

The term "nonmutual" refers to the use of the doctrine by a nonparty to a prior action "to preclude a party to that [prior] action from relitigating a previously determined issue in a subsequent lawsuit against the nonparty." *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 713 n.3 (9th Cir. 2005); *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326-28 (1979) (discussing the abandonment of the "mutuality requirement").

*T Terminal Packaging, Inc.*, 425 F.3d 708, 713 n.3 (9th Cir. 2005) (noting that offensive, as opposed to defensive, nonmutual issue preclusion involves "a plaintiff seek[ing] to prevent a defendant from relitigating an issue that the defendant previously litigated unsuccessfully against a different party"). In *Parklane Hosiery*, the Supreme Court sanctioned the use of offensive nonmutual issue preclusion and granted to trial courts "broad discretion to determine when it should be applied." 439 U.S. at 331.

**[5]** We have since specified that the application of offensive nonmutual issue preclusion is appropriate only if (1) there was a full and fair opportunity to litigate the identical issue in the prior action, *see Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1399 (9th Cir. 1992); *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1114 (9th Cir. 1999); *Appling v. State Farm Mut. Auto Ins. Co.*, 340 F.3d 769, 775 (9th Cir. 2003); (2) the issue was actually litigated in the prior action, *see Appling*, 340 F.3d at 775; (3) the issue was decided in a final judgment, *see Resolution Trust Corp.*, 186 F.3d at 1114; and (4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior action, *see id. See also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (setting out standard); *Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988) (same); RESTATEMENT (SECOND) OF JUDGMENTS § 27 & cmt. j (1982) (same).

The Supreme Court's grant of "broad discretion" to trial courts provides those courts the authority to take potential shortcomings or indices of unfairness into account when considering whether to apply offensive nonmutual issue preclusion, even where the above-listed standard prerequisites are met. *See Parklane Hosiery*, 439 U.S. at 331; *Appling*, 340 F.3d at 776. The potential shortcomings or indices of unfairness identified by the Court include whether (1) "the plaintiff had the incentive to adopt a 'wait and see' attitude in the hope that the first action by another plaintiff would result in a

favorable judgment" which might then be used against the losing defendant; (2) the defendant had the incentive to defend the first suit with full vigor, especially when future suits are not foreseeable; (3) one or more judgments entered before the one invoked as preclusive are inconsistent with the latter or each other, suggesting that reliance on a single adverse judgment would be unfair; and, (4) the defendant might be afforded procedural opportunities in the later action that were unavailable in the first "and that could readily cause a different result." *Parklane Hosiery*, 439 U.S. at 330-31; *see also* 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4465 (2002) [hereinafter FED. PRAC. & PROC.] (discussing limitations on nonmutual issue preclusion). It is against this backdrop of concerns that we consider the employees' assertion that *Thomforde II* controls our decision in this appeal.

IBM takes the position that *Thomforde II* should not have preclusive effect because (1) the decision in *Thomforde II* is not "final"; (2) there were prior inconsistent judgments; (3) there is a salient difference between the *Thomforde* action, a single plaintiff action, and the case before us, a putative collective action; and (4) the issue addressed in *Thomforde II* is not identical to the one raised in this appeal.

We do not adopt IBM's first three contentions. First, contrary to IBM's assertion that the "district court [in *Thomforde*] . . . may still consider whether, based on the actual evidence and not just the plaintiff's allegations, the [w]aiver is valid under the OWBPA," the Eighth Circuit's opinion leaves no room for such reconsideration by the district court. *See Thomforde II*, 406 F.3d at 501 (stating that "the release of claims signed by Thomforde as part of IBM's involuntary program did not satisfy the statutory waiver requirements of the [OWBPA]"). The Eighth Circuit's decision on the waiver question is thus sufficiently "final" even though there are to be further proceedings on remand on the merits of the ADEA action. *See Luben Indus., Inc. v. United States*, 707 F.2d 1037,

1040 (9th Cir. 1983) ("To be 'final' for [issue preclusion] purposes, a decision need not possess 'finality' in the sense of 28 U.S.C. § 1291."). Instead, the proper query here is whether the court's decision *on the issue as to which preclusion is sought* is final. It is. *See Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961) (Friendly, J.) (explaining that " '[f]inality' in the context [of issue preclusion] . . . may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again"); *see also* FED. PRAC. & PROC. § 4434 ("[I]ssue preclusion [has been applied] to matters resolved by preliminary rulings or to determinations of liability that have not yet been completed by an award of damages or other relief. The most prominent [of those] decisions have involved *issues that were resolved by appeal* prior to final judgment in the first action." (emphasis added)).

Second, the two judgments that IBM offers up as "prior inconsistent judgments" — *Thomforde I* (in favor of IBM) and the district court's ruling in this action (in favor of IBM) — are not pertinent judgments for the purposes of an issue preclusion determination. *Thomforde II* reversed *Thomforde I*, definitively rejecting its "application of a legal rule to the evidence." RESTATEMENT (SECOND) OF JUDGMENTS § 29 cmt. f (noting the prior inconsistent judgment rule applies where "the outcomes [of the judgments] may have been based on *equally reasonable resolutions* of doubt as to the probative strength of the evidence or the appropriate application of a legal rule to the evidence" (emphasis added)). *Thomforde I* is not a judgment on which a party to the present action may rely, and is not, therefore, inconsistent with *Thomforde II* for the purposes of our issue preclusion determination.

We also do not consider the district court's decision in this case, which we are here *reviewing*, to be a prior judgment inconsistent with *Thomforde II*. Intermediate determinations that are part of ongoing litigation do not trigger the prior

inconsistent judgment fairness concerns identified by the Supreme Court in *Parklane Hoisery*. *See* 439 U.S. at 330-31. There, the Supreme Court relied on Professor Currie's example in which "a railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26," and Currie's argument "that offensive use of collateral estoppel should not be applied [in such a circumstance] so as to allow plaintiffs 27 through 50 automatically to recover." *Id.* at 330 n.14. As this example demonstrates, allowing plaintiffs to cherry-pick favorable prior decisions to preclude issues in an ongoing or subsequent litigation raises serious fairness concerns. By contrast, *Thomforde II* is the only prior judgment that is final on the waiver matter at issue here because appellants have challenged the district court's decision in this case.

Finally, we acknowledge that there may be merit to IBM's contention that, based on the "different stakes and tactical considerations" at play in a single-plaintiff action as compared to a putative collective or class action, a defendant should not be precluded from relitigating an issue in a later collective or class action if it did not have a full and fair opportunity to litigate the issue in an earlier single-plaintiff action. The lone case cited by IBM, *Schwab v. Philip Morris USA, Inc.*, No. CV 04-1945 JBW, 2005 WL 2401645 (E.D.N.Y., Sept. 27, 2005), however, does not support its per se position that a final determination of an issue in a single-plaintiff action cannot preclude relitigation of that issue in a later-brought collective or class action. In *Schwab*, class action plaintiffs sought to preclude Philip Morris, the defendant, from relitigating the issue of whether it had conspired with other tobacco companies to defraud the public. 2005 WL 2401645, at *1. The decision in *Schwab* primarily turned on the fact that the prior case was based on distinct substantive legal grounds — state consumer fraud law rather than a RICO-based theory — not on the fact that the prior case was brought by a single plaintiff. *See id.* at *1-2. We further note that here the two litigations were occurring nearly simulta-

neously, so invocation of issue preclusion in this case was foreseeable and IBM had every incentive to litigate *Thomforde* "fully and vigorously." *See Parklane Hosiery*, 439 U.S. at 330, 332.

In the end, we do not need to decide whether the single-plaintiff nature of *Thomforde* is alone sufficient to preclude nonmutual issue preclusion. A comparison of these actions convinces us that, while the question is close, the issue decided in *Thomforde* is not identical to that raised here. *Thomforde II*, therefore, cannot preclude us from reaching the merits of this appeal.

Several factors bear on the question of whether the issue decided in *Thomforde II* is sufficiently similar to the one raised here, including whether there is a "substantial overlap between the evidence or argument . . . advanced" in both proceedings, whether "new evidence or argument involve[s] the application of the same rule of law" as applied in the earlier decided action, and the degree to which the claims advanced in both actions are "closely related." *Resolution Trust*, 186 F.3d at 1116.

IBM maintains that *Thomforde II* should not have preclusive effect here because the Eighth Circuit's holding in that case rested on *two* bases — "the lack of clarity in the Agreement" *and* "IBM's declination to tell Thomforde what it meant by the language." *See Thomforde II*, 406 F.3d at 504. The second consideration is particular to the individual plaintiff in *Thomforde* and absent here.

It is far from clear exactly what significance the *Thomforde II* panel gave to IBM's refusal to clarify the SGRA Agreement. The bulk of the opinion is devoted to explaining why the *language* of the agreement lacks clarity. *Id.* at 503-04. The significance of IBM's refusal to explain the terms of the agreement to Thomforde is not analyzed. Nevertheless, the Eighth Circuit did point to that refusal in its final summary of

the grounds for its decision. That being so, we cannot conclude that this distinct set of facts, applicable to the individual plaintiff in *Thomforde* but not to the named plaintiffs or the putative class in this case, had no role in the Eighth Circuit's ultimate conclusion that the waiver was invalid.

We note that *Thomforde II* stated, in no uncertain terms, that clarification outside the scope of the SGRA Agreement would not satisfy the strict requirements of the OWBPA. *See* 406 F.3d at 504 n.1. It is, therefore, rather unlikely that IBM's declination to clarify the agreement played a material role in Eighth Circuit's determination. With no way to verify this hunch, however, we decline to so assume.

**[6]** Because the Eighth Circuit's reasoning did not end with analysis of the language of the SGRA Agreement, but instead, expressly took into account facts specific to the individual plaintiff in that case, we conclude that the issues are not sufficiently identical between that case and this one for offensive nonmutual issue preclusion to apply. We therefore turn to the merits of this appeal.

D.

At the outset of the MERA Agreement, the employee is "advised to consult an attorney" prior to signing. The MERA Agreement goes on to provide, in relevant part:

> If you feel that you are being coerced to sign this General Release and Covenant Not to Sue (hereinafter "Release"), [or] that your signing would for any reason not be voluntary . . . you are encouraged to discuss this with your manager, the MERA Project Office or Human Resources before signing this Release.
>
> In exchange for the sums and benefits received pursuant to the terms of the MICROELECTRONICS

RESOURCE ACTION (MERA), [EMPLOYEE NAME], (hereinafter "you") agrees to release and hereby does release [IBM] . . . from all claims, demands, actions or liabilities you may have against IBM of whatever kind including, but not limited to, those that are related to your employment with IBM, the termination of that employment, or other severance payments or your eligibility for participation in the Retirement Bridge Leave of Absence, or claims for attorneys' fees.

. . . .

You also agree that this Release covers, but is not limited to, claims arising from the [ADEA], as amended, . . . and any other federal, state or local law dealing with discrimination in employment, including, but not limited to, discrimination based on sex, sexual orientation, race, national origin, religion, disability, veteran status or age . . . . This Release covers both claims that you know about and those that you may not know about which have accrued by the time you execute this Release.

. . . .

You agree that you will never institute a claim of any kind against IBM . . . including, but not limited to, claims related to your employment with IBM or the termination of that employment or other severance payments or your eligibility for participation in the Retirement Bridge Leave of Absence. If you violate this covenant not to sue by suing IBM . . . , you agree that you will pay all costs and expenses of defending against the suit incurred by IBM . . . , including reasonable attorneys' fees, and all further costs and fees, including attorneys' fees, incurred in connection with collection. This covenant not to sue

does not apply to actions based solely under the [ADEA], as amended. That means that if you were to sue IBM . . . only under the [ADEA], as amended, you would not be liable under the terms of this Release for their attorneys' fees and other costs and expenses of defending against the suit. This Release does not preclude filing a charge with the U.S. Equal Employment Opportunity Commission.

. . . .

You hereby acknowledge that you understand and agree to this General Release and Covenant Not to Sue.

End Note 1 of the agreement explains that "[t]he [ADEA] prohibits employment discrimination based on age and is enforced by the [EEOC]."

### E.

**[7]** 1. In arguing that the MERA Agreement is unclear and confusing, the employees maintain that the last sentence of the covenant not to sue,[9] when read in conjunction with End Note 1,[10] conveys "the impression that, notwithstanding the waiver, IBM employees could still obtain individual relief for their ADEA claims [filed with the EEOC]." Section 1625.22 of the *Code of Federal Regulations* provides that "[a] waiver agreement must not have the effect of misleading, misinforming, or failing to inform participants and affected individuals." 29 C.F.R. § 1625.22(b)(4). The employees argue that given the last sentence of the covenant not to sue, it was "incumbent upon IBM to provide sufficient information so as not to mislead them" about their ability to obtain victim-specific relief

---

[9]"This Release does not preclude filing a charge with the [EEOC]."

[10]"The [ADEA] prohibits employment discrimination based on age and is enforced by the [EEOC]."

by filing claims with the EEOC, the availability of such relief being, apparently, an open legal question. *See generally EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294-98 (2002).[11]

The language that the employees challenge, however, does not exaggerate or misrepresent the availability of relief via the EEOC. It merely notes that such relief is unaffected by the MERA Agreement. That representation is accurate. *See* 29 U.S.C. § 626(f)(4) ("No waiver agreement may affect the [EEOC's] rights and responsibilities to enforce this chapter. No waiver may be used to justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the [EEOC]."); *see also* S. REP. NO. 101-263, at 35, *as reprinted in* 1990 U.S.C.C.A.N. 1509, 1541 ("The legislation provides that a waiver may not interfere with the EEOC's rights and responsibilities to enforce the ADEA, nor may such a waiver be used to interfere with the employee's protected right to file a charge or to participate in an EEOC investigation or proceeding."). We conclude that the last sentence of the covenant not to sue does not render the MERA Agreement invalid.

2. The employees' core complaint is that the MERA Agreement misleads participating employees to believe that, above and beyond their unaffected right to file an ADEA claim with the EEOC, they retain the right to pursue independently an ADEA claim in court. They contend that the phrasing of the release and covenant not to sue engenders confusion over whether ADEA claims are in fact covered by the release or are excepted from it. We agree, and hold that the MERA Agreement does not satisfy the "manner calculated" requirement of the OWBPA. The employees' waiver of ADEA claims, along with the accompanying covenant not to

---

[11]We are not presented with, and do not decide the question whether the EEOC may pursue victim-specific relief where an employee has signed a waiver or release of ADEA claims.

sue, was therefore not "knowing or voluntary," and both are unenforceable.

**[8]** The MERA Agreement contains, on the one hand, a release of "*all* claims," including "claims arising from the [ADEA]" and, on the other hand, a "covenant not to sue" which includes an "agree[ment] . . . [to] never institute a claim of *any* kind against IBM . . . related to . . . employment with IBM." It also provides, however, that "[t]his covenant not to sue *does not apply* to actions based solely under the [ADEA]." (emphases added). Considering this very same language, the Eighth Circuit observed:

> [O]ne plausible reading of the document reveals that the employee releases IBM from all ADEA claims and agrees not to institute a claim of any kind against IBM, except the employee may bring an action based solely under the ADEA. Without a clear understanding of the legal differences between a release and a covenant not to sue, these provisions would seem to be contradictory; how can an employee bring a suit solely under the ADEA if the employee has waived all claims under the ADEA?

*Thomforde II*, 406 F.3d at 503.

We agree. The existence of a technical distinction between legal terms does nothing to demonstrate that the average employee confronted with the MERA Agreement would grasp the import of the distinction in a meaningful way. *See id.* at 504 ("Despite their distinct purposes, the differences between a release and a covenant not to sue are fairly amorphous and may not be readily apparent to the lay reader."); *see also Watts v. Bellsouth Telecomms., Inc.*, 316 F.3d 1203, 1207-08 (11th Cir. 2003) (observing, in ERISA context, that what may seem obvious to "attorneys and judges familiar with the law" may not to "the average plan participant"). Instead, to a lay reader — and, as we discuss below, to many lawyers as well

— these provisions seem first to release all ADEA claims an employee might have, and then to preserve a right to sue under the ADEA, implying retention, not release, of ADEA claims.

IBM protests that it "cannot fairly be faulted for including [in the agreement] a covenant not to sue that is permissible under the law and necessary for IBM to obtain an affirmative remedy [(i.e., the collection of fees and costs)] in the event of a suit based on a waived claim." According to IBM, the release and the covenant not to sue serve distinct legal purposes. So they can, but, as a practical matter, the two purposes often merge.

**[9]** Black's Law Dictionary defines "covenant not to sue" as "[a] covenant in which a party *having a right* of action agrees not to assert that right in litigation," BLACK'S LAW DICTIONARY 299 (abridged 7th ed. 2000) (emphasis added), and a "release" as "the act of giving up a right or claim to the person against whom it could have been enforced," *id.* at 1034; *see also id.* at 1276 (defining "waiver" as "[t]he voluntary relinquishment or abandonment . . . of a legal right"). This distinction is reflected in case law. *See Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 n.4 (3d Cir. 2001) ("A release is a provision that intends a present abandonment of a known right or claim. By contrast, a covenant not to sue also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue . . . ." (quotation marks omitted)); *Pacific States Lumber Co. v. Bargar*, 10 F.2d 335, 337 (9th Cir. 1926) ("Releases of, and covenants not to sue, a wrongdoer have from early times been considered distinct. A covenant not to sue one of several joint obligers or joint tortfeasors did not at common law operate to discharge others from liability, since it was said not to have the effect, technically, of extinguishing any part of the cause of action." (quotation marks omitted)); *see also Colton v. N.Y. Hosp.*, 414 N.Y.S.2d 866, 871-73 (1979) (canvassing the

"generally abstrusely worded distinction" between releases and covenants not to sue).

**[10]** The technical distinction between these terms is sometimes more apparent than real. As the court in *Colton* observed:

> [P]erhaps the most important difference between a covenant not to sue and a release [—] the effectiveness of the agreement as a bar to subsequent action by a breaching promisor [—] has long been recognized as being invariably a *distinction without a difference*. Since equity would not permit specific performance of a covenant not to sue, an action would lie for its breach. The measure of the aggrieved promisee's damages, however, would except for attorneys fees, be equal to his original liability on the underlying claim. Thus, in order to prevent a circuity of actions, where a covenant not to sue was given in perpetuity and did not involve joint torfeasors, it would be deemed to operate as a release, a complete and permanent bar to the underlying action.

414 N.Y.S.2d at 873 (emphasis added) (citation omitted).

**[11]** Further, the distinction between releases and covenants not to sue becomes particularly murky when both are included in a single document. As the EEOC recognized:

> Although ADEA covenants not to sue (absent damages) operate as the *functional equivalent of waivers*, they carry a higher risk of violating the OWBPA by virtue of their wording. An employee could read "covenant not to sue" or "promise not to sue" as giving up not only the right to challenge a past employment consequence as an ADEA violation, but also the right to challenge in court the knowing and vol-

untary nature of his or her waiver agreement. *The chance of misunderstanding is heightened if the covenant not to sue is added to an agreement that already includes an ADEA waiver clause. The covenant in such a case would have no legal effect separate from the waiver clause.* Nonetheless, its language would appear to bar an individual's access to court.

Waivers of Rights and Claims: Tender Back of Consideration, 65 Fed. Reg. 77438, 77443 (Dec. 11, 2000) (emphases added) (to be codified at 29 C.F.R. pt. 1625).

**[12]** Given this substantive overlap between releases and covenants not to sue, that fact that the MERA Agreement's covenant not to sue contains an exception for ADEA claims necessarily creates potential confusion, as it appears to *lift* any barrier from proceeding to court with an ADEA claim. The confusion ensues, in part, from including in a single document two concepts that, technically speaking, cannot coexist. Under the classic definitions contained in Black's Law Dictionary and in the case law quoted above, a covenant not to sue is pertinent only if the underlying right is *not* extinguished, while a release extinguishes any underlying right. Where both nonetheless appear in the same document, the covenant not to sue largely swallows the release — and the negation of the covenant not to sue can therefore be read as negating the release as well.

IBM stresses that without the covenant not to sue it would have been deprived of the "full benefit of its bargain" with those employees who signed on to the MERA Agreement, because without the covenant, although "IBM could raise the Release as an affirmative defense and obtain a dismissal of the suit, it still would be out its costs and attorneys' fees." IBM also maintains that the covenant not to sue was drafted to comply with the EEOC regulation that provides: "[n]o ADEA waiver agreement, covenant not to sue, or other equiv-

alent arrangement may impose any . . . penalty, or any other limitation adversely affecting any individual's right to challenge the agreement . . . . [including] provisions allowing employers to recover attorneys' fees and/or damages because of the filing of an ADEA suit." 29 C.F.R. § 1625.23(b).

**[13]** It very well may have been IBM's intention to draft an agreement that would preserve the right of an employee to challenge without penalty his waiver of ADEA claims as not knowing or voluntary. *See Thomforde II*, 406 F.3d at 504 (observing that "[t]he intended effect of the Agreement was to release the employee's substantive claims under the ADEA, while preserving the employee's right to challenge *the validity* of the release through a lawsuit, as provided by the regulations" (citing 29 C.F.R. § 1625.23(b))). If that was IBM's intention, it would have been quite easy to have accomplished this purpose directly. The MERA Agreement, by contrast, uses a term unfamiliar to lay people, "covenant not to sue," and does not explain how the release and the covenant not to sue dovetail, either in general or as they relate to the ADEA claims. *See id.* (noting that "the Agreement does not explain how the provisions relate to each other or the limited nature of the exception to the covenant not to sue in light of the release of claims"); *see also* 29 C.F.R. § 1625.22(b)(3) ("Consideration [of the need to draft waiver agreements in plain language] . . . usually will require the limitation or elimination of technical jargon and of long, complex sentences.").

Indeed, far from explaining the intended, independent functions of the release and of the covenant not to sue, the MERA Agreement muddles the matter by referring to both provisions with the same shorthand name — "Release" — indicating interchangeability, not distinction. *See Thomforde II*, 406 F.3d at 504 (noting same). Adding to the confusion, the paragraph containing the covenant not to sue in fact refers to the covenant and the broader "Release" as if the terms were completely interchangeable. *See id.* (noting same).

**[14]** In reaching its conclusion that the MERA Agreement satisfies the "manner calculated" requirement for ADEA waivers, the district court, looking to the technical, legal distinction between a release and a covenant not to sue, noted that "[t]o the extent the language of the [MERA Agreement] requires clarification, the [agreement] explicitly advises affected employees to consult an attorney, their manager, the MERA Project Office or Human Resources prior to signing." IBM now advances a similar argument. We do not agree that the direction to consult an attorney or an IBM employee mitigates confusing waiver language.

As explained in *Thomforde II*,

> [i]t seems axiomatic that if an agreement needs clarification, it is not written in a manner calculated to be understood. To rely on the agreement's direction to seek legal advice, a separate statutory requirement for a valid waiver, *see* [29 U.S.C.] § 626(f)(1)(E), for clarification of the waiver would nullify the distinct requirement that the agreement be written in a manner calculated to be understood by the participant (as opposed to his attorney).

406 F.3d at 504 n.1. As this passage indicates, were we to embrace IBM's suggestion that any lack of clarity might be cured by compliance with § 626(f)(1)(E), we would rob all purpose from the distinct "manner calculated" requirement set forth in subsection (A).

We decline, as we must, the invitation to so construe the OWBPA. "[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Market Co. v. Hoffman*, 101 U.S. 112, 115-16 (1879) (internal quotation marks omitted), *cited with approval in Duncan v. Walker*, 533 U.S. 167, 174 (2001); *see United States v. 144,774 Pounds of Blue King Crab*, 410 F.3d 1131, 1134 (9th Cir. 2005), *cert.*

*denied sub nom. Deep Sea Fisheries, Inc. v. United States*, 126 S. Ct. 828 (Dec. 12, 2005). As the Sixth Circuit has explained, "Congress's intent in enacting § 626 was to compel employers to provide data so that an employee considering waiving ADEA rights could assess, with the assistance of counsel, the viability of a potential ADEA claim."[12] *Raczak v. Ameritech Corp.*, 103 F.3d 1257, 1259 (6th Cir. 1997) (construing 29 U.S.C. § 626(f)(1)(H)); *see Am. Airlines v. Cardoza-Rodriguez*, 133 F.3d 111, 118 (1st Cir. 1998) (following *Raczak*); *see also* S. REP. NO. 101-263, at 34, *as reprinted in* 1990 U.S.C.C.A.N. 1509, 1540 (noting that "[d]ue to the complexity of [group termination and exit incentive] programs, the Committee views the assistance of counsel as a practical necessity in analyzing the programs and determining whether a violation of the Act has occurred"). The independent statutory requirement that waivers of ADEA rights and claims be written in a "manner calculated" to be understood by the average affected employee serves a different purpose entirely: that employees do not acquiesce to such waivers unwittingly. *See* S. REP. NO. 101-263, at 5, *as reprinted in* 1990 U.S.C.C.A.N. 1509, 1510.

[15] We hold that the MERA Agreement does not satisfy

---

[12]Section 626(f)(1)(H) provides:

[I]f a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer . . . informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to —

(i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1)(H).

the "manner calculated" requirement of the OWBPA, was not "knowing and voluntary," and cannot be enforced. The district court's dismissal is reversed, and the case is remanded for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**